CLEMENGER et al. v. FLESHER.*
(No. 8328.)

(Court of Civil Appeals of Texas. Ft. Worth. Feb. 19, 1916. Rehearing Denied March 18, 1916.)

1. MINES AND MINERALS ☞79(7)—OIL LEASE—TESTING—FORFEITURE—ELECTION.

Upon failure to pay rentals due on an oil lease contract, *held*, the lessor, under its terms, might have canceled it or sued for the rent, but he was not entitled to both remedies, as they are inconsistent.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 209; Dec. Dig. ☞79(7).]

2. APPEAL AND ERROR ☞931(1)—FINDINGS—CONCLUSIVENESS.

In determining whether the trial court erred in finding a fact, the evidence must be viewed in the light most favorable to the appellee.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3762; Dec. Dig. ☞931(1).]

3. MINES AND MINERALS ☞79(7)—OIL LEASE—TESTING—FORFEITURE—WAIVER.

A lessor demanding either the rent or release of an oil lease, and after not receiving either taking no steps to cancel the lease, cannot be held as a matter of law to have elected to cancel the lease.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 209; Dec. Dig. ☞79(7).]

Appeal from District Court, Wichita County; E. W. Nicholson, Judge.

Action by J. H. Flesher against F. J. Clemenger and another. From judgment for plaintiff, defendants appeal. Affirmed.

Carrigan, Montgomery & Britain, of Wichita Falls, for appellants. Smoot & Smoot, of Wichita Falls, for appellee.

CONNER, C. J. F. J. Clemenger and T. B. Smith have appealed from a judgment against them in favor of the appellee, J. H. Flesher, in the sum of $1,650. The suit was based upon an oil lease contract covering a period of 5 years, which provided, among other things, that the "second parties (appellants) agree to commence a well on said premises within 90 days from date (February 8, 1912), or pay to first parties (appellee) at the rate of $50 for each month thereafter, payable quarterly in advance for completion of well until a well is completed; and it is further agreed and understood that failure by party of the second part to pay said rentals shall render this contract null and void."

There was another provision of the contract reading:

"It is further agreed by all parties of this contract that failure of the parties of the second part to comply with the condition of this contract, this contract shall become null and void."

Other provisions of the contract need not be set out.

It is undisputed that appellants never drilled, nor attempted to drill, a well as provided for in the contract, and the only defense that was made to the action that we need notice was—

"that, after the 90-day period for the beginning of the drilling of the well had elapsed, plaintiff elected to forfeit the lease, and notified defendants to that effect, and demanded a release of the contract from one of the defendants, and said defendant Smith promised and agreed to release the same as soon as he was able to obtain the signature of his codefendant, and that plaintiff accepted said proposition, and thereby elected to terminate said lease, and that by reason of said facts the plaintiff was not entitled to recover any sum of money on said contract."

The trial was before the court without a jury, and we have no formal conclusions of fact and law. We must, however, impute to the court's judgment a finding against the defense above quoted. Appellants in effect conceded, as indeed it must be conceded (Thornton's Law relating to Oil & Gas [2d Ed.] § 151 et seq.), that the paragraphs of the contract providing for the contingencies under which it may be forfeited inured to the benefit of the plaintiff alone, and that unless the appellee's action was defeated by an election to declare the contract forfeited, as pleaded by them, that then the judgment must stand. In other words, the sole question raised on this appeal is whether the trial court erred in finding, as in effect it did, that after the expiration of the 90-day period for beginning the oil well under the lease contract, appellee did not exercise any election to declare the contract forfeited as he might have done under the terms of the lease.

On this subject the appellant Smith testified, in substance, that the first time that he saw appellee Flesher after the execution of the lease contract was some 10 or 15 days after the 90-day term of the lease had expired.

"Mr. Flesher told me, 'That lease has expired and I want you to release, to clear the title to my property;' and I said, 'So far as I am concerned, I will give you a release myself, but it would not be any account, I don't think, without Mr. Clemenger would sign it; but, as soon as I can locate Mr. Clemenger, I will gladly give you a release on your property;' and he said that was perfectly satisfactory with him. I made

an effort to locate Mr. Clemenger, and I inquired of all the oil men I knew, and he was somewhere in Louisiana or down in that country, and I could not locate him. Mr. Flesher has never demanded a penny of rentals from me under this contract; he had never said a word about any rentals due until he filed that suit for that amount of money. When he came to see me he did not say a thing about my owing him anything; all he asked me for was a release, and I told him I would give it to him just as soon as I could get it, and he said it would be all right, that he wanted to get a release to clear the title to his property. As soon as I located Mr. Clemenger, I had a release written out and mailed to him at Houston, and I received this release back, and went down to Mr. Flesher's farm and delivered it to him in person, and he stated that he could not take the release, that I would have to take it up with his lawyer, that it was in his hands. I executed this instrument; it is a release of the land that belongs to Mr. Flesher in Clay county. It is a release of the original lease we obtained in 1912 from Mr. Flesher. Mr. Clemenger's signature is on it, and he acknowledged it. I took that release to Mr. Flesher at his home down in Clay county. This instrument is dated the 25th day of May, 1914. My acknowledgment to it is dated May 1, 1914. I caused the release to be written. I tendered that release to Mr. Flesher at his own home. It must have been June 1 or 2, 1914, that I went down to see Mr. Flesher and gave him this release."

The appellee Flesher, after having testified to the execution of the lease contract, further said:

"I did not do anything or see any of them until the first 90 days ran out, and I tried to get to see Mr. Smith here in town, but I never could catch him, and I was talking to one of my neighbors that had worked for Mr. Smith, and he told me where to get his address; and I went to Mr. Smith's house and told him that the lease money was due and had been for several days. It was something like a couple of weeks, or maybe 15 or 20 days, after the 90 days. I told him I either wanted the lease money or a release to my farm. I did not tell him I would take the lease away from him. When I asked him for a release, he said, 'You are not entitled to a release; I have talked to somebody about it and you don't have to have any release at all. It is already released.' He did not furnish me a release. He did not furnish me with a release until several days after this suit had been filed. I have never given any other lease on my land. I have never at any time told either of these defendants that they could not go to work on the land. I have always been willing for them to put down a well if they would go to work; there was a contract drawed up to that effect; I could not have kept them off, I don't suppose, if I had tried. It only took me a very short time to get service on Mr. Clemenger."

On cross-examination he testified:

"If they will pay up the back money they can go ahead and drill. I have not been willing for them to drill since the first rent money was due and not paid, unless they would pay the rentals. I regarded this lease null and void to a certain extent at the end of the 90 days. After the 90 days was up I did not think they had a right to drill on my land until they paid the lease rental. The lease provided, 'And it is further agreed by and between all parties of this contract that the failure of the party of the second part to comply with the conditions of this contract, this contract shall become null and void;' that was written in the lease with ink. I thought I understood this contract at the time I signed it. It was in the contract that a failure on the part of the party of the second part to pay the rental shall render this contract

null and void. I do not know whether I can say what the provision, 'Failure of parties of the second part to pay such rental shall render this contract null and void,' in the lease means, but the provision was placed in the lease for just what it says. If they failed to comply with the contract it became null and void. This lease says that they were to pay me $50 a month in advance or drill a well in 90 days, and if they failed to pay me in advance the contract was null and void, and that is what the contract says. I understood the way I signed the lease that the contract held me until I had a release. There is not any provision in it, but I have signed up before a notary public that I do that of my own free will, which I did, but yet I have no release from that document, and therefore I claim that that holds me binding, that I could not release to another party until I have a release and it is recorded on my land. When they failed to drill the well at the end of the 90 days from the date of the contract and failed to pay me the rental at the end of that time I went to see Mr. Smith. The first thing I said to him was that I was entitled to my lease money or a release, and I demanded one or the other. Mr. Smith told me that he had consulted a lawyer, and the lawyer had told him you did not need any release, that it was dead of its own accord. Mr. Smith refused to pay me the rent, and told me my lease was null and void and that I did not have to have a release. I did not think that was true, and told him so at the time. I did not regard that they had any rights to the land after the 90 days had expired, until they paid the lease money, and I have not been willing since that time for them to go and drill on the land until they paid the lease rentals."

On redirect examination he testified:

"I considered the lease as still binding on me. I had two indirect chances to lease my land I might say. I had not a direct chance, but I had two, we might say, indirect chances, to lease, of two different oil companies, which one of them did lease afterwards Mr. Fouck's place and several other places. No one came to see me personally about leasing my land. Some one sent a representative out to see me with reference to leasing."

On recross-examination:

"I cannot tell you what date I met Mr. Smith and told him about the lease having expired, but I met him on the sidewalk, and we stopped and was talking about it, and I told him there that I had to have a release against that land before I could have a clear title to my land. Mr. Smith offered me a release after we brought suit, and I refused to take it, because I had turned it over to my lawyer."

Appellant Clemenger testified that he was well known in the oil world; that he made his headquarters at the Bender Hotel at Houston, and always attended to his business thoroughly, and that letters of importance that he thought ought to come he always received.

It is said in 15 Cyc. 259, that:

"Any decisive act of a party, with knowledge of his rights and of the facts, determines his election in case of conflicting and inconsistent remedies."

But it is said on the same subject (page 260):

"Although acts prior to the actual commencement of legal proceedings indicate an intention to rely upon one remedial right, yet they do not constitute an election which will preclude the subsequent prosecution of an action or suit based upon an inconsistent remedial right, unless the act contains an element of estoppel in pais."

Of the same general tenor is the reading in 9 R. C. L., bottom page 960, par. 7. See, also, Witherspoon v. Staley, 156 S. W. 557; Brodkey v. Lesser, 157 S. W. 458; Stone Land & Cattle Co. v. Boon, 73 Tex. 548, 11 S. W. 544.

[1, 2] Upon the failure of appellants to drill a well upon appellee's premises within the 90-day period specified in the contract, and upon the further failure to pay rentals as in the lease contract provided, appellee clearly had two remedies. He might, under the terms of the lease contract, have declared the lease void and have insisted upon its cancellation; or he might, as he later did do in this suit, declare upon the contract and recover of appellants the specified rentals. Appellee, of course, was not entitled to both remedies, as they are evidently inconsistent. So that if it must be said that under the evidence appellee in fact elected to cancel his lease, as appellants pleaded, then the judgment below should be reversed and here rendered for appellants. In determining this, however, we must view the evidence in the light most favorable to appellee. See Waggoner v. Dodson, 96 Tex. 415, 73 S. W. 517; Cartwright v. Canode (Sup.) 171 S. W. 696; F. & M. Gin Co. v. Simmons, 178 S. W. 621.

[3] We do not feel that we can say that the court erred in his construction of the evidence. Conceding that appellee expressed a willingness to cancel the lease, and that the contract did not provide for a release on the part of appellants in the event that it was declared void, appellee nevertheless had the right to fix the condition upon which he was willing to exercise his option to forfeit, and hence might reasonably insist upon a release before exercising his option to cancel the lease contract. As he testified, the lease had been acknowledged, spread upon the records of the county, and without a formal release on the part of appellants, or a judgment of cancellation, the lease contract would cast a cloud upon appellee's title. At least appellee so regarded it and his testimony is susceptible of the construction, we think, that appellee understood that the contract bound him until appellants did execute a release, for he says that he had several indirect opportunities to lease his land to others of which he did not avail himself.

Appellee testified:

"I told him (Smith) I either wanted the lease money or a release to my farm. I did not tell him I would take the lease away from him."

The very language quoted authorized the conclusion that appellee at that time did not definitely intend to exercise his right to declare the lease forfeited. A demand for one of two things is not a demand for one to the exclusion of the other. Appellee thereafter instituted no suit to compel a cancellation of the lease contract, and we find no act on his part which, in law, necessarily concluded him in the present action. Appellants failed

to execute a release until after the beginning of this suit, which, it seems, was not instituted for some time after the rentals under the lease contract began to accrue; but appellants in their answer set up no reason why appellee should be estopped on this account. It is not alleged or shown that, by reason alone of appellee's action, they were induced to rest in peace, and thereby incur obligations to pay rentals, when they could or would have otherwise prevented it. For aught the record shows, they may have deliberately rested in the matter with the hope that other developments in the section would later justify them in proceeding to drill wells, and otherwise perform their obligation under the lease contract they had made with appellee.

At all events, by the express terms of the lease contract, appellants became obligated either to drill a well within 90 days, or to pay within the life of the lease $50 per month until the well was completed. It is undisputed that this was not done, and the finding and the judgment of the trial court being to the effect that appellee elected to stand upon his contract, and there being no dispute as to the correctness of the amount of the judgment rendered, we think the judgment below must be affirmed.

Affirmed.