MRS. RUBY HOLMES ET AL. V. IRA G. YATES ET AL.

No. 6025. Decided May 13, 1933.
(61 S. W., 2d Series, 771.)

*R. J. Randolph,* of Austin, and *Jones & Lyles,* of Del Rio, for plaintiffs in error.

The so-called corrected field notes which purported to exclude the land in controversy, and which was free from conflict on the ground with a prior or senior location and which had been previously designated and set apart to the public free school fund by virtue of the original survey were unauthorized and without legal effect, and the original survey and the field notes having been made and filed pursuant to law and fully authorized thereby constituted the section of land.

Should it be held that the Land Commissioner was authorized to require the corrected field notes on account of the actual conflict that did exist, his recognition and acceptance of the corrected field notes because they conformed to the land office map, would not conclusively fix the boundaries of the survey, and cause the land in controversy which was free from actual conflict, to become no longer a part of the section which was originally surveyed for the school fund, thereby in effect divesting the school fund of its title thereto and reinvesting it in the public domain.

Articles 3909, 3918-3920, 4275, 4276, R. S., 1879; Article 4274, R. S., 1895; Articles 3696, 5385, 5407, 5418, R. S., 1911; Constitution of Texas, art. 7, sec. 2; State v. Robison, 119 Texas, 302, 30 S. W. (2d) 292; Adams v. Houston & T. C. Ry Co., 70 Texas, 275; Post v. Embrey, 205 S. W., 514; Eyl v. State, 84 S. W., 607; Frisbie v. Smith, 13 Texas C. A., 385, 35 S. W., 336; Main v. Cartwright, 200 S. W., 847; Snider v. Methvin, 60 Texas, 487; Chadion v. MaGee, 20 Texas, 477; McLellan v. Brown, 209 S. W., 177; Smith v. Sublett, 28 Texas, 163; Jumbo Cattle Company v. Bacon, 79 Texas, 5; Childress County Land & Cattle Co. v. Baker, 56 S. W., 756; Nations v. Miller, 107 Texas, 616, 183 S. W., 154; Berger v. Arnold, 24 S. W., 528; Henrick v. Cavanaugh, 60 Texas, 1; Norton's Succession v. Land Commissioner, 2 Texas, 357; Joyce v. Sisk, 62 S. W., 960; Willoughby v. Long, 96 Texas, 194, 71 S. W., 545.

*J. W. Hill, Smith & Neill,* of San Angelo, *Burney Braly,* of Fort Worth, and *R. J. Fellingham,* of Chicago, Ill., for defendants in error.

Upon their first counter proposition, as set out in the opinion of the court, defendants in error cite: Articles 3918, 3919, 3920, R. S., 1879; Montgomery Co. v. Angier (Civ. App.), 74

S. W., 957; Jones v. Petty (Civ. App.), 146 S. W., 663; Garcia v. State (Civ. App.), 274 S. W., 319; Sullivan v. State (Civ. App.), 95 S. W., 645; Hamilton v. State (Civ. App.), 152 S. W., 1117; U. S. v. Roselius, 15 How., 31, 14 L. Ed., 587; DeArguello v. U. S., 18 How., 546, 15 L. Ed., 478; Forbes v. Withers, 71 Texas, 302, 9 S. W., 164; Austin v. Dungan, 46 Texas, 236; Miller v. Yates (Civ. App.), 15 S. W. (2d) 730; Smith v. Powers, 2 Texas, 57 (loc. cit.) 72; N. Y. & T. Land Co. v. Thomson, 83 Texas, 169, 17 S. W., 520.

Equity will not permit a person to accept the benefit of a conveyance and refuse to be bound by the burdens imposed by it. Rube Holmes only obligated himself to pay for 407 acres, and on the strength of that obligation there was awarded to him only 407 acres, and his successors in interest ought not now to be heard to say that the award effectively vested him with title to more than 407 acres. It was purely a voluntary transaction on his part. If he did not desire to buy only 407 acres he was not obliged to do so, but when his application and the award was limited to the 407 acres, the record announced to the world that he claimed only 407 acres. Doty v. Barnard, 92 Texas, 104, 47 S. W., 712.

*Jay H. Brown,* of Austin, as amicus curaie.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

The Supreme Court adopts findings and statement in this case by the Honorable Court of Civil Appeals as follows:

"On February 16 1887, O. W. Williams, deputy county surveyor of Pecos county, made out original field notes of sections 101 and 102, block 194, Texas Central Railway Company surveys; the latter section being the public school alternate of section 101; each of the four lines of said surveys having a length of 1,900 varas. Such field notes were filed in the general land office March 3d of the same year, and called for an acreage of 640 acres in each section. The commissioner of the general land office claimed that such field notes were in conflict with Block 194, Gulf, Colorado & Santa Fe Railway Company, an older and superior location. Upon instructions from the land commissioner, Williams made out corrected field notes for the two sections calling for the east and west lines to have a length of 1,209 varas instead of the original 1,900 varas. The original field notes were marked in the land office, 'cancelled by corrected notes.'

"On April 14, 1894, a patent was issued to M. C. Miller,

assignee, to section 101 as containing 407 acres. Section 102 was classified on December 2, 1887, as dry grazing land, 640 acres, and appraised at $2.00 per acre. In the revised list of unsold school land in Pecos county, made September 27, 1901, section 102 was classified as dry grazing land, 407 acres, and appraised at $1.00 per acre. It was again classified as dry grazing land, 407 acres, on November 30, 1901, and on November 20, 1903. On November 20, 1908, it was classified as grazing and mineral, 407 acres, and appraised at $2.00 per acre, and on May 21, 1912, it was classified as mineral and grazing, 407 acres, and appraised at $1.50 per acre. On July 24, 1914, Rube Holmes made application to purchase section 102 as 407 acres, appraised at $1.50 per acre as additional land to his home tract; the application containing an express reservation of the mineral estate if the land were classed as mineral. This application was filed in the land office July 29, 1914, and the land was awarded to him August 26, 1914. Holmes proved his three years' occupancy of the land and obtained a certificate thereon, and on October 22, 1917, sold the section, described as containing 407 acres, to J. H. Tippett.

"In 1918 shortly after the sale to Tippett, Rube Holmes died intestate. On October 9, 1920, I. G. Yates filed a letter of inquiry as to a vacancy which included the land in controversy. A survey was made of the alleged vacancy by R. S. Dod, a licensed state land surveyor, and on November 8, 1920, a set of field notes of a survey, designated as survey 34½ made by Dod, were filed in the land office. Thereafter Yates made application to purchase said survey, and on April 13, 1927, a patent therefor was issued to him. Yates subsequent to his application to purchase executed certain oil and gas leases, and the production of oil and gas began on said land in September, 1927. On December 27, 1928, Mrs. Ruby Holmes, individually and as survivor of the community estate of herself and her deceased husband, Rube Holmes, filed an application for an adjustment on the account of section 102 in the land office, which was refused by the land commissioner.

"On March 19, 1928, corrected field notes made by J. A. Simpson, licensed land surveyor, of section 102, were filed in the land office. The notes included the original 407 acres and the 212.3 acres in dispute. These notes were disapproved by the commissioner. Mrs. Holmes, on February 16, 1929, filed in the land office her affidavit to the effect that she was the owner of the 212.3 acres in controversy, that same had never been transferred or sold, and tendered the sum of $500.00 to

pay interest or principal and interest thereon. This affidavit was accompanied by a photostatic copy of the Simpson field notes. The tender was rejected, and on August 14, 1929, Mrs. Holmes and George S. Anderson, to whom she had executed an oil and gas lease, brought this suit in trespass to try title and for damages for the oil produced and taken from the property against Yates and the McMan Oil & Gas Company and the Continental Oil Company.

"Appellees answered by plea of not guilty, pleaded the three, five, two, and one year statutes of limitations, estoppel, and alleged that they were bona fide purchasers for value, without notice, and as such were entitled to be protected against appellants' right of recovery.

"The case was tried before the court, and resulted in a judgment that appellants take nothing from which they have appealed." 38 S. W. (2d) 651 to 652.

■ The controlling contention of plaintiffs in error is found in the following portion of the argument of their counsel, on pages 15 and 16 of their brief in the Supreme Court, to-wit:

"If corrected field notes leave out or exclude land not in actual conflict with a senior survey, they are unauthorized and incorrect, and cannot be considered a substitute for the originals. If they are not truly correct, then, there is no substitute, and the result, the original surveys remain the same and the field notes thereof constitute the section of land. In this case, no doubt the Land Commissioner was justified in making an investigation, but he had no authority to call upon the locating surveyor to correct the field notes so far as to cause the survey to conform to the maps and records of his office. The law required the Land Commissioner to correct his maps and records to conform to actual surveys on the ground, rather than have the surveys which had been made on the ground changed so as to correspond with such maps and records of his office. It is true the so-called corrected field notes did not go outside of and include land not included in the original survey, but it is equally true that they did not include all of the land within the original survey not covered by a senior survey, and for that reason are incorrect and unauthorized. Corrected field notes to be given effect as being authorized, should not be confined to the original survey, but it is essential that they should not exclude land which is free from conflict on the ground with a prior location and survey. In other words, for the corrected field notes to be correct and authorized under the law, they must be confined to the original survey and must embrace all

the land therein not in conflict on the ground with land previously appropriated. These so-called corrected field notes do not meet such requirements for the reason they exclude the land in controversy which should have been embraced therein."

The Court is unable to recognize the soundness of the above contention. It would be difficult to conceive a more far-reaching method for unsettling land titles throughout Texas than for the Supreme Court to sanction the contention of plaintiffs in error. Instead, we regard as entirely correct the first counter-proposition of defendants in error Yates and another, which is as follows:

"Where corrected field notes of a survey made under a located land certificate and of its alternate school survey are required to be filed by the Commissioner of the General Land Office to take same out of a conflict with prior and senior locations as shown by maps, records and archives of the General Land Office the fact that many years later it is discovered that the conflict on the ground existed only as to part of the area embraced in the original field notes but excluded from said corrected field notes, instead of the whole of it, does not render said corrected field notes void, and make the said school land alternate thus embrace all the area within the original field notes not actually in conflict, and which might have been, but were not, included within such corrected field notes, so that one who several years before such discovery had purchased such school land alternate location under said corrected field notes could not be held to have acquired title to such excluded area as against intervening purchasers thereof from the state of a subsequently made survey embracing such area."

The above conclusions result necessarily from the effect of filing the corrected field notes and their adoption by the claimant under the original files and surveys, as fully set out in our opinion this day filed in the case of Miller v. Yates (post 435).

■ The Commissioner of the General Land office does not by his act alone accomplish any reduction of the area included in the valid original field notes. He performs his duty in advising the surveyor or claimant of errors according to his official maps. The reduction in area follows the return by or for the claimant of field notes for reduced acreage, adopted by the Commissioner and locator. Should the Commissioner refuse to approve a correct survey, he can be compelled by the courts to do so.

As far back as 2 Texas (p. 57), this Court has recognized the duty of the Land Commissioner to refuse patents to titled

lands according to the maps and records of his office. Thus, in Smith v. Power, the Court sensibly declared:

"It is a cardinal principle, that claims against the Government are to be satisfied out of vacant lands, but the map of the county is the only guide furnished the Commissioner, by which these can be ascertained; and where there has been no default on the part of the county survey, in making out the map according to the provisions of the law on the subject, and none in the Commissioner in transmitting such surveys for delineation, as by law he is required to do, it would seem that the Commissioner, as a general rule, is fully authorized, and it becomes his imperative duty to issue patents for lands, not represented on the general map of the surveys of the county"; that is to say, it is the Commissioner's duty to patent lands shown by his records to be unappropriated, and none other. Of course he can always correct mistakes in his records, on proper showings.

■ The Commissioner here performed his plain duty in pointing out the incorrectness of the field notes under the Pecos County map and the other archives of his office, and in calling for corrected field notes. The only lawful course for the locator to pursue was to either have the corrections made to conform to the Commissioner's directions, or else to have the land surveyed on the ground and establish his right to hold a vacant area larger than that shown by the Land Office archives. The locator, Miller, adopted the corrected field notes, if he did not file same, clearly intending to receive for himself 407 acres defined by the corrected field notes, and at the same time to have surveyed for the public free school fund 407 acres, defined also by corrected field notes.

■■ There are other reasons equally cogent in necessitating an affirmance of the judgments of both lower courts. Miller accepted title to his 407 acres, abandoning all claim to more land. Rube Holmes, under whom plaintiffs in error claim, made application to buy not the land originally surveyed, but the section 102 which contained 407 acres under the corrected field notes. He paid and obligated himself to pay for the 407 acres embraced in the corrected field notes. He sold and conveyed to J. H. Tippett the section 102 of only 407 acres. When he died, neither he nor his community survivor owned any part of the land sued for, he having bought the precise tract of 407 acres which he afterwards sold and conveyed. Having never had any title whatever to the land surrendered under the corrected sur-

vey, his widow has no claim thereto as survivor of the community nor as heir to the estate of her deceased husband. Being without title, she conveyed none to Anderson.

For want of title in plaintiffs in error, the trial court correctly entered judgment that they take nothing by this suit, and such judgment was rightly affirmed by the Court of Civil Appeals.

The judgments of both courts below are accordingly in all things confirmed.