STANOLIND OIL & GAS CO. et al. v. STATE et al.

No. 8537.

Court of Civil Appeals of Texas. Austin.

June 30, 1937.

Motions for Rehearing Overruled Feb. 16, 1938.

Turner, Rodgers & Winn, of Dallas, Clay Tallman and Donald Campbell, both of Tulsa, Okl., for appellant Stanolind Oil & Gas Co.

Cantey, Hanger & McMahon, Gillis A. Johnson, and Warren Scarbrough, all of Fort Worth, for appellees-appellants John H. Tyler and Eulia B. Tyler.

Geo. T. Wilson, of San Angelo, and Henry H. Brooks, of Austin, for appellees Cardinal Oil Co., Dogie Oil Co., Geo. D. Morgan, J. H. Arthur, Bob Reid, and H. W. Compton.

William McCraw, Atty. Gen., and H. Grady Chandler, Asst. Atty. Gen., for appellee State of Texas.

Collins, Jackson & Snodgrass, of San Angelo, for appellee M. D. Bryant.

McCLENDON, Chief Justice.

This is a boundary suit. It involves a strip of land 122.5 varas wide (east-west) and 1,209 varas long, having for its east line the west line of the Tyler survey (J. H. Tyler survey No. 1); and for its west line the east line of survey 104 (T. C. Ry. Co. survey No. 104) as located by the trial court. The involved land is within the Yates oil field in Pecos county. The suit was by the state, and was predicated upon the theory of a vacancy of at least 122.5 varas in width between the Tyler and 104. The mineral rights in 104 (subject to royalty interests, including that of the state) are owned by the Stanolind (appellant Stanolind Oil & Gas Company). The appeal is by the Stanolind from a judgment upon a directed verdict establishing the vacancy as claimed by the state.

The west line of the Tyler is established on the ground. The existence vel non of the vacancy and its width (if it exists) depend upon the true location of the east line of 104. This line is 7,600 varas east of the west line of 3 (Runnels county school land survey No. 3), which is a due south projection of the west line of 70 (I. & G. N. R. R. Company, block 1, survey No. 70). This latter line is 4,112 varas west of the southeast corner of 70. The true location of that corner is therefore determinative of the boundary issue.

The area in this vicinity has been a fruitful subject of boundary litigation since the discovery of oil in the Yates field. Several of these cases have reached the appellate courts, and the relative location of the surveys in the vicinity, their history, embracing the work of original surveyors and that of subsequent surveyors, have been carried with much particularity into the opinions of the Supreme Court and of the El Paso and Austin Courts of Civil Appeals. While it has been necessary for us to peruse the entire statement of facts (1,000 pages), the issues presented are comparatively simple; and since the evidence introduced has been in large measure stated in some of the other cases, we can see no useful purpose in reiterating it here except in general outline, referring for more detail to opinions in the other cases. At this point we refer to the maps in the following cases: Pandem Oil Corporation v. Goodrich, Tex. Civ.App., 29 S.W.2d 877, at page 879; Turner v. Smith, 122 Tex. 338, at page 355, 61 S.W.2d 792; Stanolind O. & G. Co. v. State, Tex.Sup., 101 S.W.2d 801, at page 803.

The state has granted four oil and gas leases upon the involved land, covering respectively the following area:

1. A strip 19 varas wide immediately to the west of the Tyler, to which we shall refer as the Dogie (Dogie Oil Company) lease.

2. Two strips approximately 52.6 varas wide, one immediately west of the south half of the Dogie, the other immediately west of the north half of the Dogie. To these we shall refer as the Cardinal (Cardinal Oil Company) leases.

3. A strip 50.9 varas wide immediately to the west of the Cardinal leases. To this we shall refer as the Bryant lease.

The west line of the Tyler (the location of which is not in dispute) is 7,600

varas east of the west line of 3 as located from a monument placed by Dod for the southwest corner of 3. For a detailed description of Dod's work, see opinions in Pandem Case, Tex.Civ.App., 29 S.W.2d 877, Stanolind Case, Tex.Sup., 101 S.W.2d 801, and State v. Stanolind O. & G. Co., Tex.Civ.App., 96 S.W.2d 297, 298.

The west line of the Dogie lease is 7,-600 varas east of the west line of 3 as located from Dod's monumented southwest corner of 70 and northwest corner of 3.

The west lines of the Cardinal leases are 7,600 varas east of the west line of 3 as located from the so-called car spring corner as southeast corner of 70. See Stanolind opinions, above.

The west line of the Bryant lease is 7,600 varas east of the west line of 3 as located from a point 47 varas north and 50.6 varas west of the car spring corner. This point was fixed as the southeast corner of 70 by George, a licensed land surveyor in the employ of Stanolind. The directed verdict establishing the vacancy is predicated upon the theory that the Stanolind was estopped from controverting the George location. This subject will be treated later.

It is now contended by the Stanolind that the monument of Dod for the southwest corner of 3 was adjudicated as the correct location of that corner in the Supreme Court's decision in the Stanolind Case. In this we do not agree. The location of the west line neither of 3 nor of 70 was necessarily involved in the final decision of the Supreme Court. The proper location of the south line of 70 was directly involved in that decision, and since its location depended upon the location of its east terminus (southeast corner of 70), that corner was involved as to its northing, but not necessarily as to its easting. We think clearly the Stanolind decision rests upon an adjudication that the southeast corner of 70 is not farther north than the car spring corner. This for the following reasons: The Stanolind Case was a suit by the state for a 215-vara strip between the south lines of 101, 102, 103, and 104, and the north line of the Yates survey No. 34½. The location of the latter is established on the ground. Describing the tract sued for by metes and bounds, the state fixed the southwest corner of 101 by beginning at the car spring corner (as southeast corner of 70); thence west 4,112 varas (the called length of the 70 south line); thence south 6,121 varas

(the combined lengths of the west lines of 3 and 101, 4,912 varas + 1,209 varas) "to the beginning point of this tract, being the area herein sued for, same being the true S. W. corner of survey 101, Block 194, T. C. Ry. Co., as patented." See Stanolind Case above, 101 S.W.2d 801, at page 803, col. 2, and page 804, col. 1. From this beginning point the area sued for is described: Thence east with south lines of 101, 102, 103, and 104, "7600 varas to the South East corner of Survey 104, for the North East corner of this tract"; thence south 215 varas to point in north line of 34½, "which point is 215 varas south and about 250 varas West of a stone mound on a flat rock marked 'SE 104 Dod Oct. 15, 1918'"; thence west to point where 34½ north line is intersected by south projection of 101 west line; thence north to place of beginning. The state filed an alternative pleading predicated upon the George location of the 70 southeast corner. This pleading is copied and its effect adjudicated in a rehearing opinion in the Stanolind Case, Tex.Sup., 104 S.W.2d 1, 2. The state's hypothesis in bringing the suit was that survey 3 (an office survey) must be located by course and distance calls from its beginning (northwest) corner, the southwest corner of 70, discarding the adjoinder calls for western lines and corners of river surveys 69 to 65, inclusive. This method would locate its south line 4,912 varas south of its north line and the south lines of 101–104 (also office surveys) 6,121 varas south of the north line of 3. The south lines of 101–104 thus located would lie 215 varas north of the north line of 34½; thus leaving the vacancy sued for. This theory was adopted by the El Paso court, predicated in the main upon the majority opinion in the Smith-Turner Case. The trial court and the Supreme Court rejected this theory, and gave validity to the adjoinder calls of 3 for the west lines and corners of the river surveys. In so doing the Supreme Court adopted the work of Dod (approved by the land commissioner) in giving each of the river surveys 61–69, inclusive, an excess width of 43 varas. Dod found the southeast corner of 61 and the northeast corner of 69 (southeast 70), but was unable to locate any original corner between these points. He found an excess over calls between these points of 387 varas, which he apportioned among the nine affected surveys. He did not find the original marked southeast corner of 70, but from the description of that corner in the original field note calls of 70 he placed it either at

the car spring corner, or on an east-west line with that corner. It is manifest that if this corner is located 47 varas farther north, this additional excess would have to be apportioned among the nine river surveys (61–69). This would throw the south line of 65, 20.9 varas farther north than the Dod location and create a vacancy of that width between 34½ and 101–104. Since the judgment of the trial court was upon a directed verdict, its affirmance by the Supreme Court necessarily, as above stated, adjudicated the location of the south line of 70 as not farther north than the car spring corner. We quote from the rehearing opinion in the Stanolind Case:

"We agree with the contention that an issue of fact was presented as to the exact distance north and south between the south line of survey 70 and the south line of survey 61, but, taking the distance as the shortest one testified to by any witness, the most favorable construction from the State's viewpoint, and prorating the excess thus resulting between the intervening surveys, no vacancy exists between the south line of the T. C. Railway Company surveys and the most southerly north line of the Yates survey No. 34½. We reannounce this conclusion after a most careful consideration of the interesting theories advanced in the motion for rehearing in the light of the evidence bearing thereon.

"In view of the contentions on rehearing we make the observation that our opinion is not to be construed as a fact finding as to the location on the ground of the southeast corner of survey 70. That issue was not submitted to the jury in the trial court and the evidence is conflicting with reference thereto. We simply hold that the State cannot complain in this proceeding of our action in deciding this case on the basis that the car spring corner is the true one, in view of its pleadings and contentions in the lower courts."

It will be noted that the east 50.6 varas of the particularly described area sued for by the state in the Stanolind Case is coincident with the south 215 varas of the Bryant lease. Since both the state and the Stanolind were parties to that suit, and since the state was decreed to take nothing by that suit, it would seem to follow that at least as to that portion of the area sued for the judgment in the Stanolind Case would be res judicata against the state's right to recover in this suit. It would also seem to follow from the

above-quoted holding of the Supreme Court in the Stanolind Case, predicated as it appears to be upon the car spring corner location of the southeast corner of 70, that that location should be held conclusive in this case both under the principle of res judicata and under the doctrine of stare decisis as announced by this court in Porter v. State, 15 S.W.2d 191, Blaffer v. State, 31 S.W.2d 172, error refused in both cases, and Douglas Oil Co. v. State, California Case, 70 S.W.2d 452, 453, and more recently confirmed by the Supreme Court in Federal Royalty Co. v. State, Whiteside Case, 98 S.W.2d 993.

However, since the Supreme Court in their rehearing opinion in the Stanolind Case expressly hold that their decision is not to be construed as determining the question of vacancy east of 104, we make no ruling upon that point. The court say: "Of course, the decision in this case should not be construed as a determination in favor of or against the existence of such a vacancy."

■ It is the state's contention that the only evidence in this case of the true location of the 70 southeast corner was that of the surveyor George, and therefore the judgment establishing the vacancy must be affirmed. This is not correct. The Stanolind introduced the Dod reports. These reports describe the terrain adjacent to his location of the 70 southeast corner and set forth in detail his reasons for locating that corner where he did. The car spring corner fits that location both as to northing and as to the river meanders as set forth by him and in the original 70 field notes. Moreover, Dod ran the lines of 3, based upon his location of 70 southeast corner, and monumented 70 southwest, and 3 northwest corner. If his location of 70 southeast corner can be arrived at in no other way, then it would seem that his monumented southwest corner of 70 would at least furnish some probative evidence in locating his location of the southeast corner of 70. It should be noted in this connection that the El Paso court in the Pandem Case held that the car spring corner was the true original southeast corner of 70; and this was based upon Dod's report. The judgment in that case was reversed upon another ground. Tex.Com.App., 48 S.W.2d 606.

We will now consider the above-stated issue of estoppel, the evidence upon which was in substance as follows: September 26, 1934, the Stanolind, "By H. L. George, Authorized Agent," filed with Lee, county surveyor of Pecos county, an application for survey under "an Act approved May 29, 1931," of a tract bounded on the north by 3, on the east by the Tyler, on the south by 34½, and on the west by 104. Under this application George, as "Licensed Land Surveyor of San Angelo, Texas," prepared field notes, certified by him as having been made from a survey "made by me on the ground, and according to law." These field notes were indorsed "adopted" by George, January 19, 1935. They were recorded by Lee in the surveyor's records of Pecos county, January 16, 1935, and were filed in the land office January 21, 1935. The state introduced George as a witness who testified to locating the southeast corner of 70 at a point 47 varas north and 50.6 varas west of the car spring corner. Without attempting to detail George's testimony on this point, it may be stated generally that he did not claim to have found any evidence on the ground at this location, but arrived at his conclusion by bisecting the distance (2,000 varas) between the north line of 70 and the south line of 69 located by him from points on the river which he fixed as original northeast corner of 70 and southeast corner of 69. The south line of 69 thus located is 953 (1,000–47) varas south of the car spring corner or 40 varas north of Dod's prorated location of the south line of 69. Accepting the south line of 69 as thus located, it would give a total excess in width between 69 south line and 61 south line of 384 varas, or a prorated excess of 48 varas per section. If surveys 65–68, inclusive, be laid out with this excess from the south line of 69 thus located, a vacancy of 20 varas would be created between 101–104 and 34½. The Stanolind decision decrees that no vacancy exists between these surveys.

At the time Stanolind made its application for survey, there was pending in Pecos county a mandamus proceeding by Tyler against the county surveyor to compel a survey of the area in suit. The land commissioner had refused to recognize a vacancy east of 104, because no vacancy appeared upon the land office maps. However, the commissioner later ordered a survey confining the surveyor to the area bounded on the west by the east line of 104, "determined by measuring 7600 varas eastward along the south

line of Runnels County school land survey No. 3, from its southwest corner, as established and marked by R. S. Dod." In accordance with this survey, Tyler was awarded the strip 114 varas wide adjoining the area in suit on the east. Tyler's mandamus proceeding, however, was not dismissed or otherwise disposed of, but was still pending when this suit was tried. Tyler contended, and still contends that he was entitled to an award as lessee as discoverer of all the land in suit under his original application for survey. In addition to the Tyler application and suit, there was pending at the time of the Stanolind application an application by Hogan which eventuated in the Dogie lease. It therefore appears that at the time of the Stanolind application the east line of 104 was not only in doubt, but was the subject of an actual controversy.

Under these circumstances, we see no valid reason why the Stanolind was not free to make application to purchase on the theory of vacancy without surrendering its title under 104, in case its application were refused. The application under these circumstances might well be regarded in the nature of an offer of compromise, the Stanolind being willing to pay the price of purchase, rather than risk its chances under its title to 104. Had the Stanolind been awarded the land under its application, we would have had an entirely different question. But such is not the case. It received nothing under its application, the status of which had not proceeded beyond the stage of an unaccepted offer wholly unilateral and not binding upon either party. The following hypothetical example is illustrative of the situation here: A is the real owner of a tract of land which B also claims. A, doubtful of his own title, offers to buy from B. B refuses to sell and sues A for the land. Clearly A is not estopped to show his real title.

The Stanolind urges that, in any event, it was entitled to an award under its application to lease. The state contends that this application was void because George, by whom it was made, was a licensed land surveyor. We sustain the state's contention in this regard. The powers, duties, and obligations of licensed land surveyors are set forth in chapter 2, title 86, R.C.S. Particularly we refer to articles 5272–5281, inclusive. From these, it will be observed, a licensed land surveyor is a public official, required to take an oath of office and have an official seal. The license may be revoked if the licensee "shall be found by the Board to have unlawfully given information concerning any undisclosed public land or to have been directly or indirectly interested in the purchase or in the acquisition of title to any public land." Article 5273. Article 5278 requires that: "If a licensed surveyor shall discover an undisclosed tract of public land he shall not make known that fact to anyone except to such person as may have it enclosed, but he shall forward to the Land Office a report of the existence of such tract and the acreage therein, and its probable value."

The policy of the state with reference to dealings by its public surveyors in its public lands is announced in the following cases: Wills v. Abbey, 27 Tex. 202; Cotulla v. Laxson, 60 Tex. 443; State v. Thompson, 64 Tex. 690; DeShazo v. Eubank, Tex. Com.App., 222 S.W. 976. All of the acts of such surveyors are held to be void where they have any interest in the subject matter involved.

The Stanolind contends that the principle announced in these cases applies only where the surveyor has some interest, direct or indirect, in the ultimate title emanating from the state; that George had no such interest, nor in fact any interest in the application, but was only acting as agent for the Stanolind. We think it clear in principle that his disqualification to act as principal in the application also disqualified him from acting as agent. Moreover, since the land here involved was not inclosed, it was a breach of official duty to disclose to any one but the land commissioner the fact that the land was public domain. The application by him on behalf of the Stanolind manifestly constituted such breach of official duty. By the express terms of the statute creating such duty, he thereby became the agent of the state to conceal the facts from the Stanolind and reveal them to the proper state official. He could not, therefore, act for the Stanolind, whose interests were antagonistic to those of the state.

The Stanolind cites Gray v. State, 7 Tex. App. 10, as authority for the proposition that article 142 of the Penal Code does not apply to licensed land surveyors. This we think is wholly immaterial. The civil statutes above cited expressly relate to licensed land surveyors, and they declare the policy of the state in this regard. The fact that violation of the prescribed duties is not also

made a criminal offense does not affect the validity of the acts in violation of the civil statutes. See State v. Standard Oil Co., Tex.Sup., 107 S.W.2d 550.

The Stanolind further urges that the state had parted with all interest in the land in suit which would give it the right of possession, and therefore it could not maintain an action of trespass to try title, citing State v. Dayton Lumber Co., 106 Tex. 41, 155 S.W. 1178, and Shell Pet. Corp. v. State, Tex.Civ.App., 86 S.W.2d 245. These cases have no application here. The state had never parted with its title to the surface rights, or otherwise except as to the oil and gas mineral interests.

. Error is also assigned upon overruling a plea in abatement based upon the pendency of a suit by the Stanolind in the federal court at El Paso against the state's lessees under the mineral leases. The state was not a party to that suit, and could not be made a party without its consent, which it has never given. It could not be deprived of its right to litigate its title in a forum of its own choice, by the filing of a suit in another forum.

Since we are remanding the cause generally, it is not necessary for us to consider assignments predicated upon the trial court's action in overruling motions for continuance.

Tyler and wife have separately appealed upon assignments urging error in not awarding to Tyler a lease upon the area covered by the Dogie and Cardinal leases. These assignments are predicated upon the proposition that Tyler was the discoverer of the vacancy through his application of inquiry (and proceedings and surveys thereunder) made December 15, 1926, under Rev. St.1925, art. 5323, which gave him a preference right to lease under the act of 1931 (Gen.Laws 42d Leg., chapter 271, p. 452, Vernon's Ann.Civ.St. art. 5421c), the pertinent part of which, section 8, p. 454, Vernon's Ann.Civ.St. art. 5421c, § 8, reads: "Any. person who discovers an unsurveyed area of school land which has not been listed on the records of the Land Office as school land, and is not in actual conflict on the ground with land previously sold or appropriated and which appears on the official Land Office map as unsurveyed land, may apply in writing to the county surveyor and have the same surveyed, and after the field notes thereof have been returned to the Land Office and approved and filed with the Land Commissioner, shall have a preference right for sixty (60) days thereafter to purchase a mineral lease thereon at the minimum price fixed by the Land Commissioner, in addition to the other consideration provided herein."

The material facts are: The land commissioner refused to recognize any vacant land under the application, and April 9, 1928, Tyler brought a mandamus proceeding against the county surveyor, under an interlocutory order in which a survey was made. That proceeding, as above stated, is still pending. There was a great deal of communication, both verbally and by letter, between Tyler and the land office, in which Tyler was insisting that he be awarded the land under his 1926 application. Finally, under advice of the Attorney General, the commissioner revised his previous ruling of "no vacancy," and authorized Tyler to have a survey made by Baker, a licensed land surveyor. In his instructions to Baker, the commissioner set forth the boundaries of the survey to be made, giving the west line as the east line of 104 "when this East line is determined by measuring 7,600 varas eastward along the south line of Runnels County School land survey No. 3, from its southwest corner, as established and marked by R. S. Dod, for the northeast corner of said survey No. 104." Survey was made according to these instructions, and patent was issued to and accepted by Tyler May 24, 1934, covering the strip 114 varas wide (24.41 acres) between the area in suit and 34½. Baker declined to show adjoiner to 104, on the ground that he placed the southwest corner of 3 farther west than the Dod monument. However, the commissioner declined to extend the field notes of the Tyler farther west than the 114 varas west of 34½, and patent was issued and accepted with the area thus delineated. In the meantime (January 24, 1934), Hogan had applied for a survey and lease under the 1931 act covering the 19-vara strip west of the Tyler, eventuating in the Dogie lease April 12, 1935, after the following steps had been taken: Original field notes filed January 31, 1934; corrected field notes filed January 18, 1935; final field notes filed in county surveyor's office April 11, 1935, and in the land office April 12, 1935. This lease passed by mesne conveyances to Dogie Oil Company. The Cardinal leases were executed March 19, 1934, upon applications filed, respectively, November 4 and 5, 1934. It is unnecessary to recite the va-

rious steps leading up to the consummation of these leases. Tyler did not file any application for survey or lease under the 1931 act until March 18, 1935.

The Tylers make two contentions in support of their assignments:

1. The acceptance of patent to Tyler survey No. 1 did not exhaust Tyler's claim under the 1926 application for survey.

2. Tyler was the discoverer of the vacancy through his survey in 1928, and was therefore entitled to a lease under the 1931 act.

■ The first contention is clearly negatived by the holding in Miller v. Yates, 122 Tex. 435, 61 S.W.2d 767, and Holmes v. Yates, 122 Tex. 428, 61 S.W.2d 771. This holding is to the effect that when one accepts a patent under corrected field notes he loses all right to additional area embraced in prior field notes. Tyler seeks to distinguish his situation from that in the cited cases, on the ground that he had a suit pending to establish his rights, which suit was not required to be dismissed by the land commissioner as a condition precedent to issuance of patent, but was still pending. And further that he continued to insist that he was entitled to more land than was embraced in the patent. These facts clearly do not distinguish the cases in principle. The land commissioner refused to approve Tyler's prior field notes, and required a further survey and field notes corrected in accordance therewith. Tyler accepted patent embodying these corrected field notes, and thereby terminated his rights under his 1926 application. His protests to the effect that he was entitled to more land were clearly unavailing, and he was relegated to whatever rights he might have, independently of his 1926 application. Nor does the fact that the suit was not dismissed alter the situation.

As to the Tylers' second contention: This is predicated upon the construction of the 1931 act, to the effect that the original discoverer of a vacancy who brings the matter to the attention of the land commissioner is entitled to a preference right to lease, regardless of the time when he makes application under the act. As we interpret the Tylers' brief, there can be but one discovery and but one discoverer of a vacancy. We do not so interpret the language of the act. The discovery is of an "unsurveyed area of school land which has not been listed on the records of the land office as school land." As long as the land is not so listed, it is

clearly open to discovery by any one who may care to make an application to lease. The word "discover," while in the abstract, may have a well-defined meaning, nevertheless, like many other words in our language, may vary as to its meaning in accordance with its contextual use. Generally it means to uncover or discover that which was hid, concealed, or unknown. But hid or concealed from or unknown to whom? In the abstract, perhaps, every one. But not necessarily so in every situation.

The discovery alluded to in the 1931 act we think clearly means the discovery by "any person" to the land commissioner, by means of an application to lease under the 1931 act. It is not requisite that the applicant be the sole possessor of the information upon which the application is based, nor that he be the first to acquire that information. Nor do we think the source of such information important, except, perhaps in a case involving breach of faith or fraud—a subject with which we are not here concerned. It is only requisite that the land be not listed on the records of the land office as school land, and that the applicant conform to the statutory requirements. If the land commissioner should conclude from the survey made under the application that the land belonged to the school fund and otherwise came within the act, it would be his duty to appraise the value of the mineral title and make the lease. If he should conclude otherwise, and deny the application, the applicant could have his rights adjudicated in the courts. In either event the applicant would be the party "who discovered" the "unsurveyed area" within the meaning of the 1931 act. That the land was not listed in the land office arose from the fact that the commissioner had never regarded it as a part of the public domain. If he so regarded it, his duty would be to so list it; or in any event to request suit by the Attorney General to have it so decreed.

■ The underlying policy of the 1931 act was to encourage private individuals, at their own expense, to bring into the school fund mineral lands properly belonging to the fund which had not theretofore been listed as such. The benefits of the statute enured to the one who discovered that the land was not so listed, and made application in compliance with the statute. This is, we think, the only practical construction of the statute which would effectuate its purpose. Any other construction would lead to interminable confusion.

The situation regarding the area in suit presents a striking illustration. The uncovering of the existence of the vacancy had its inception in the work of Dod, whose reports became records of the land office between 1917 and 1920. In that year Yates filed an application to purchase all the vacant area east and south of the T. C. Railway surveys. In a sense Yates might be regarded as the discoverer of the vacancy. However, he accepted a patent to 34½ which fixed his boundaries on the ground and excluded the area in suit. He thereby abandoned any claim to area outside of his patent calls. He was not thereby precluded from making another application, but he did not do so. Tyler is in the same situation. True, he had an independent survey made, but his 1926 application was predicated to some extent, at least, upon the work of Dod. This application was to purchase under article 5323, which was expressly repealed by the 1931 act. This application terminated in the patent to Tyler survey No. 1. All rights under the 1926 application were merged and concluded by acceptance of that patent. He could not thereafter make another application under article 5323 because it had been repealed. The area in suit being still unlisted in the land office, it was subject to lease by "any person" (including Tyler) making application under and otherwise complying with the 1931 statute. Tyler did make such application March 18, 1935. In the meantime, however, the rights of applicants for the Dogie and Cardinal areas had attached. And clearly, we think, they were superior to those of Tyler.

Those portions of the trial court's judgment denying the lease applications of Tyler and Stanolind are affirmed. In other respects, the trial court's judgment is reversed and the cause remanded.

Affirmed in part and in part reversed and remanded.

### On Motions for Rehearing.

The motion asserts that our statement that, "the west line of the Dogie lease is 7600 varas east of the west line of 3 as located from Dod's monumented S. W. corner of 70 and N. W. corner of 3," is not supported by the evidence. We have carefully re-examined this matter and adhere to the statement as written.

It is further urged that regardless of inaccuracies in these figures and calculations, our analysis of the Supreme Court's opinion in the Stanolind Case, implicit from these calculations, is "absolutely immaterial." In this connection it is urged by the state that we were in error in concluding (1) that the decision of the Supreme Court in the Stanolind Case was based upon an adjudication that the southeast corner of 70 is not farther north than the car spring corner; and (2) that the Supreme Court adopted the work of Dod.

The calculations referred to by appellant are predicated upon the work of Dod and his finding of an excess of 43 varas per section in the nine river sections, 61–69. It is clear to us that the Supreme Court's decision in the Stanolind Case is predicated upon an adjudication, in so far as that case is concerned, that the south line of 70 is not farther north than the car spring corner; and also an adoption by the Supreme Court of the method employed by Dod, that is, prorating the excess among the nine river sections. Of course, if Dod's survey was inaccurate as to the distance between the two points found by him (southeast 70 and southeast 61), this would affect (increase or diminish) the width of each of the involved river sections. As we understand the Stanolind opinion, the asserted 215-vara vacancy between 101–104 and 34½ is predicated upon the difference between the called east lines of 3+101 and the actual location on the ground of the north line of 34½. In other words, this 215 varas exactly coincides with a 43-vara excess in the west lines of the five river surveys, 65–69 (43x5=215). The holding of the Supreme Court that the calls in the east line of 3 for the west lines and corners of the river surveys necessarily adjudicates the south line of No. 3 as beginning at a point 162 varas south of the south line of 65. Consequently, the true location of 65 was determinative of the issue involved in the Stanolind Case. Since this line, however, was not located on the ground and had to be fixed by prorating the excess between the two points found by Dod, the true location of 65 south line necessarily was dependent upon the location of the south lines of both 70 and 61. If the excess between those lines is in fact 43 varas per section, and 70 is located at the car spring corner, then necessarily the south line of 101–104 is coincident with the north line of 34½. If the excess between 70 south and 61 south is greater than 43

varas per section, and the car spring corner correctly locates south 70, the south line of 101–104 would fall south of the north line of 34½, thus eliminating any vacancy. If, on the other hand, this prorated excess is less than 43 varas per section, then the south line of 101–104 would fall north of the north line of 34½, and a vacancy would be created. It must be held in mind that, the judgment in the Stanolind Case was predicated, not upon a jury finding, but upon a directed verdict, and the Supreme Court necessarily adjudicated the nonexistence of a vacancy between 101–104 and 34½. That the Supreme Court in fact based its decision upon the holding that for the purposes of that case, predicated upon the pleadings of the state, the car spring corner was the true southeast corner of 70, we think clear. However, as stated in our original opinion, it seems to have been the purpose of the Supreme Court to make no adjudication of that corner or of the location as to its northing, other than for the particular purpose of its decision in that case. Disclaimer of the binding effect of its decision upon other litigation was express. For this reason, we made no adjudication as to the position either of the south line or southeast corner of 70, but left such location open as a question of fact. This seems to be the conclusion reached by the Supreme Court, predicated upon the evidence, as distinguished from the pleadings in the Stanolind Case. As stated in our original opinion, the question of vacancy vel non and its extent in so far as this case is concerned depends solely upon the true location of the southeast corner of 70. We made and make no fact finding determinative of that issue.

In a printed argument, in support of the motions of appellants Bryant and Tyler and wife, it is insisted that the action of Stanolind in applying to purchase the involved land from the state as vacant land and its various acts thereunder constituted an election between inconsistent rights, thereby creating an estoppel to assert title under the alleged true and inconsistent location of the east line of 104. The following cases, are cited in support of this contention.: Seamans Oil Co. v. Guy, 114 Tex. 42, 262 S.W. 473; Id., 115 Tex. 93, 94, 276 S.W. 424; Clemenger v. Flesher, Tex.Civ.App., 185 S.W. 304; Bauman v. Jaffray, 6 Tex. Civ.App. 489, 26 S.W. 260; Stine v. Producers' Oil Co., Tex.Civ.App., 203 S.W. 126; Providence Ins. Co. v. Boatner, Tex.Civ.

App., 225 S.W. 1115. We have carefully examined these cases. The doctrine announced in these cases seems well grounded in our jurisprudence. It is predicated upon equitable estoppel. That doctrine, however, we do not regard as applicable to the present case. We believe we have correctly analyzed the transaction in our original opinion. If so, our holding correctly follows.

■ In an amicus curiæ motion filed by attorneys representing clients in other pending cases, objection is made to the portion of our original opinion reading: "The discovery alluded to in the 1931 act we think clearly means the discovery by 'any person' to the land commissioner, by means of an application to lease under the 1931 act."

It is stated that this language is being construed as holding that the party who first files his application for purchase in the land office is entitled to priority over one who had made an earlier application for survey but had not filed his application to purchase until later. The quoted language was not intended to so hold, nor do we think it is fairly susceptible of that construction. The point under consideration was whether the party who first discovered the existence of a vacancy was entitled to priority regardless of the date of his application under the 1931 act. The thought embodied in the quotation is that the rights of a party under the act are fixed by means of compliance with the act. An application to purchase is, of course, essential. As prerequisite thereto, a survey is necessary. The applicaton for survey constitutes the first step under the act and no doubt fixes the rights of the applicant in so far as time is concerned. Failure or refusal to follow up the application for survey with such application to purchase would defeat the accrual of any rights under the application for survey. The effect of unreasonable delay or laches in filing the application to purchase is a question with which we are not here concerned. We think the language of the original opinion, read in the light of the facts presented for adjudication, sufficiently expresses our holding. The question pointed out in the amicus curiæ motion was not before us, and consequently not adjudicated.

Except in so far as the original opinion is corrected or modified above, the several motions are overruled.

Corrections made in original opinion, and motions overruled.