Uriah Gould and wife *v.* C. S. West, executor, etc.

1—A grant by the State to a dead man, though void according to the common or the civil law for want of a grantee, is valid under the act of December 24th, 1851, whether made before or after the passage of that act.

2—By force of that statute a patent issued in the name of a dead man enures to his heirs in virtue of their right of inheritance, unless he had alienated the land in his lifetime—in which latter case the patent enures to the alienee as against the heirs.

3—If a location made on public land in 1838 was sufficiently specific to furnish notice to persons of ordinary diligence that an appropriation of the land was thereby made, it vested the right to the land even before any survey made or patent issued; and by such a location the land became capable of alienation immediately, though no survey was then made, and though no patent issued during the lifetime of the locator.

4—A vendor of land who in his deed affirms his seizin or possession of the land is estopped by his deed from afterwards denying that he had title; and after his death his heirs are in like manner estopped from denying his title, and from claiming the land by descent from him, even under a title acquired in his right after the deed was made by him.

5—When a vendor has conveyed land with a covenant of warranty against his heirs, the covenant will operate as a rebutter to a claim of his heirs to the land, even though he conveyed the land wrongfully or before he had any title to convey.

6—In such a case, it seems, the heirs can not avoid the estoppel by impeaching the consideration of their ancestor's deed, when they do not allege that the deed was procured by any fraud or force.

7—Nor can the heir thus estopped maintain the defense of three years' limitation against the vendee of the ancestor, although patent issued in the ancestor's name after his death; for in such case the patent, by force of the act of December 24th, 1851, above cited, enured to the vendee, and not to the heir, and constituted neither title nor color of title in the latter.

ERROR from Bastrop.    Tried below before the Hon. J. J. Thornton.

This suit was brought in the District Court of Bastrop county on the 16th of February, 1857, by R. J. Townes, Robert Mills, and David G. Mills, against Uriah Gould and Ann Eliza Gould, his wife, and Edward and James McCarty, defendants. Townes died during the pendency of the suit, and C. S. West, his executor, became a party in his stead.

The plaintiffs alleged in their petition that on the 2d of September, 1839, Jacob G. Lentz executed and delivered to Jesse Haldeman a deed for one half of a league of land in Bostrop county, known as league No. 20.    The deed was set out in full, as follows:

" REPUBLIC OF TEXAS,    )
    "*County of Bastrop.* (   Know all men by these presents, that I, Jacob G. Lentz, do this day bargain, sell and convey all my right and title to Jesse Haldeman, one-half league of land, known as my headright drawn from the Mexican government, the boundaries as follows, known as league 20, beginning, etc., (here follow metes and bounds), making the equal half of said league. I, Jacob Lentz, do bargain and sell the same to Jesse Haldeman, his heirs and assigns, to have and to hold forever, and to dispose of as he thinks proper. I bind myself, and heirs, and assigns, to make good this bond to said Haldeman forever, which I do acknowledge. I do acknowl-

edge I have received five thousand dollars in cash in hand, paid by J. Haldeman, and am satisfied that I have received the full value thereof. I hereunto set my hand this second day of September, one thousand eight hundred and thirty-nine, before said witness;" which deed was recorded in Bastrop county, on or about September 3d, 1840.

The petition alleged that Lentz was living on the league at the date of the deed, and that he then delivered possession to Haldeman of the half of the league conveyed by the deed; that on the 24th of June, 1844, Haldeman sold and conveyed the half league to the plaintiff, Townes, for the price of one dollar per acre, paid by Townes on or about that date. That Townes purchased and paid for the land in good faith, and without any notice that the land was claimed adversely by the defendants. That on or about the 23d of October, 1848, Townes sold eight hundred acres of the land to the plaintiffs, Robert and D. G. Mills.

The petition alleged that the defendants, Gould and wife, about 1st of June, 1854, under the pretense that the latter had inherited the land from her father, the said Jacob G. Lentz, entered on and took possession of three hundred and fifty-two acres of the half league sold by Lentz to Haldeman, and subsequently, in August, 1856, undertook to sell and convey the same to the defendant, Edward McCarty, who sold part of the tract to the defendant, James McCarty; and that these latter parties withhold possession of the 352 acres from the plaintiffs.

The above outline of the original petition will suffice to indicate the general nature of the suit, and it seems unnecessary to recapitulate the several subsequent pleadings. The other heirs of Jacob G. Lentz were admitted to join Gould and wife in defense to the suit. They denied that Haldeman had ever paid anything whatever as a consideration for the land, and alleged that in 1835 Haldeman contracted with Lentz to clear out and perfect the title of the latter to the league, and for so doing was to be entitled to one-half of it. They averred that Haldeman did obtain a pretended title to be issued to Lentz,

but that it was issued by one Robert Peebles (who was, or assumed to be, commissioner of Austin and Williams' Colony) after the closing of the land offices by the act of the consultation, and was therefore contrary to law and void. That Lentz being ignorant of the law and of his rights, and believing himself legally possessed and invested with title, executed the deed to Haldeman; but that, in fact, the said Lentz never did in his lifetime have or acquire any legal right or title to the land. That after his death, these defendants obtained a certificate for a league and labor of land, and caused it to be located on the said league, for which they caused a patent to issue to them.

This patent shows on its face that it issued to " Jacob G. Lentz, his heirs or assigns," and bore date May 5th, 1847, being some six years after the death of Lentz.

The defense of limitation of three years was also relied on by the defendants.

The act of the Legislature of December 24th, 1851, respecting patents issued in the names of deceased persons, being omitted from the Digests of our Statutes, is here set out in full :

" An Act to render valid and effectual to legal claimants patents for land which have been issued, or may be issued, in the names of deceased persons.

" Section 1. *Be it enacted by the Legislature of the State of Texas,* That all patents for land which have heretofore been issued by the authorities of the Republic or State of Texas in the names of persons then, at the time of issuing such patents, deceased, and all patents for lands which may be issued hereafter by authority of the State of Texas in the names of persons deceased at the time at which said patents may be issued, shall be, to all intents, and purposes, and effects, as valid and effectual to convey and secure to the heirs or assigns, as the case may be, of such deceased persons, the lands as patented, as though such deceased persons had been in being at the time such patents bear date, provided that nothing in this act contained shall be so construed as to validate any claim not otherwise just and legal, but it shall simply mean that a

patent issued to one not in being at the time said patent issued, shall not be void for such cause.

"SEC. 2. That this act take effect and be in force from and after its passage." Approved, December 24, 1851. (Pamphlet acts of 1851, page 21.)

The cause came to trial at the December term, 1867. The plaintiffs rested on their title derived under the deed of J. G. Lentz to Haldeman, made in 1839. The defendants were admitted to be the only heirs of Lentz. They introduced the patent and evidence of sundry witnesses, to prove that no consideration ever passed from Haldeman to Lentz for the deed or land. Plaintiffs introduced evidence to show that Haldeman cleared out Lentz's title to the whole league. In view of the opinion of this court, it is not deemed material to detail the evidence particularly, and reference is here made to the opinion for such other facts as have any bearing on the rulings.

The jury returned a verdict for the plaintiffs, and judgment was rendered accordingly. Defendants moved for a new trial, and on its refusal bring their writ of error.

*Chandler, Turner & Carleton* and *P. Claiborne*, for plaintiffs in error, discussed the evidence, for the purpose of showing that no consideration for the land in controversy ever passed from Haldeman to Lentz, and that Lentz in his lifetime never acquired any title to the land. They then proceeded as follows to argue that Townes and his vendees were chargeable with notice of the defects in the title, though they admitted that no actual notice of the defects had been brought home to them.

But we assume and propose so show, from an unbroken chain of the highest authorities, that where a vendee purchases from a vendor who has an equitable or imperfect title, that he takes it, subject to any and every legal or equitable defect in the title of his vendor; in other words, if his vendor has anything but a legal title, that he acquires no higher right or better title than his vendor had, and that whatever would defeat the title or

equity of his vendor, will defeat him; and we commence to discuss this point with the fact staring us in the face, that J. G. Lentz had no title when he made the deed to Haldeman, and had none at his death. He had, at most, but a dormant equity against the government for a league and labor of land, and the right to locate the league, half of which is the subject of this controversy, as long as it was vacant.

In the case of Dormer v. Fortescue, Lord Hardwicke, in discussing the question whether or not a vendee was chargeable with notice of all the defects in the title of his vendor, when his vendor's title was not a legal title, said: "But where a man shall be said to be *bonæ fidei possessor*, is where the person possessing is ignorant of all the facts and circumstances relating to his adversary's title; which could not be here, for Mr. Justice Fortescue had all the deeds, and the very settlement on which the title depended. (See 3 Adkyns' Reports, p. 134.)

And Lord Chancellor Thurlow held the same doctrine in the case of Coppin v. Tennyhaugh. (2 Brown's Reports, pp. 296, 297.)

Again, in the case of Moore v. Bennett, decided one hundred years ago, the Court of Chancery said that any title less than legal was an implied notice to the vendees, and uses the following language: "A makes a conveyance to B, with power of revocation by will, and limits other uses if A dispose to a purchaser by the will; another purchaser subsequent is intended to have notice of the will as well as of the power to revoke, and this is, in law, a notice, and so it is in all cases where the purchaser can not make out a title but by a deed which leads him to another fact, the purchaser shall not be a purchaser without notice of that fact, but shall be cognizant thereof, for it is *crassa negligentia* that he sought not after it. (See cases in Chancery, top page 244, side page 246.)

The last cited case we think directly in point. Haldeman of course knew he had no title; that is, the law forced him to know that Lentz had no title, and consequently he (Haldeman)

acquired none on his part; and the land was a part of the public domain of Texas. That being so, and the land remaining in the same condition in September, 1844, when Townes obtained his deed from Haldeman, he could not make out his title without tracing it back to the grant extended by Peoples to Lentz, which was void, and not *voidable simply.* Haldeman acquired, at most, an equitable right or title to one-half of the J. G. Lentz headright, provided he had paid for it, which he never did do, as the proof shows. And we find that the highest tribunals in the United States have carried this doctrine even further. It was so elaborately discussed by the Supreme Court of the United States in the case of Brush v. Ware, that we respectfully request the court to read that case. (See 15 Peters' R., p. 93.) The same doctrine is held by the Supreme Court of Tennessee, in the case of Pierson & Harkness v. Ivey, 1 Yerger's R., pp. 296 to 302. And again, in the case of Nelson v. Allen & Harris, (1 Yerger, pp. 360 to 372,) in which case the court reviewed a large number of the authorities upon this point, and the court is requested to read it.

In the case of Dexter v. Harris (2 Mason's R., p. 536), Judge story, in discussing this question, says: " The doctrine upon this subject as to purchasers is this : that they are affected with constructive notice of all that is apparent upon the face of the title deeds, under which they claim, *and of such other facts, as those already known* necessarily put *them upon inquiry for*, and as such inquiry, pursued with ordinary diligence and prudence, would bring to their knowledge."

We might refer the court to quite a number of the decisions of this court corroborating the authorities that we had cited, and we will refer to the case of York v. McNutt, 16 Tex., 13. In that case McNutt executed to Hughes his bond for title, and obligated himself to make title as soon as he obtained his patent from the government. No other condition was in it. Hughes transferred the bond to Coe for a valuable consideration, without any notice of any failure of consideration or fraud, or that the consideration was a void one. And Coe, in

like manner, transferred it to York. Yet the learned Chief Justice Hemphill said: "It must be admitted that there is great apparent hardship in affecting subsequent vendees with all the equities, though latent, which may subsist between the vendor and the first vendee, where the sale is only of the equitable title, and especially so where the rule is well established that a subsequent purchaser without notice will be protected against the equities of the vendor, or those claiming in priority under him. But it appears very clearly from the authorities, that the protection given to purchasers for valuable consideration without notice, extends only to cases where they have taken a conveyance, or, in other words, *where they have purchased the legal title.* (Dart on Vendors, 462; 4 Dess., 274; 8 Cranch, 462; 10 Peters, 177; 7 Peters, 252.) But where the purchase is only of the equitable title, it is taken with all its imperfections and equities, notwithstanding a valuable consideration may have been given, and there may have been no notice of the equity or defense against the title. (12 S. & R., 389; 2 Watts, 459.) In the case of Chew v. Barnett, 12 L. & R., 380, the court say that ' where it is asserted that a purchaser for a valuable consideration takes the title free of every trust or equity of which he has no notice, it is intended of the purchase of a title perfect on its face; for every purchaser of an imperfect title takes it with all its imperfections on its head. It is his own fault that he confides in a title which appears defective, and he does so at his peril.' Under this view of the law, the title of Hughes and of his assignees, Coe and York, was but a title to go into equity to have the legal estate conveyed, and in the hands of the assignees was subject to all the defenses against the original vendee." (See 16 Tex., 16, 17.)

If the purchasers of that bond were chargeable with the defects in Hughes' title, surely Townes was chargeable with all the defects and want of consideration in Haldeman's title. The case cited is so full upon the subject that we respectfully ask the court to read it.

So far as R. & D. G. Mills' title is concerned, they are in

no better condition than their co-defendant, for they have failed to prove they are innocent purchasers in good faith, without notice.

In the case of Watkins v. Edwards, 23 Texas Reports, 447, this court said: "It must appear that the purchase money was *bona fide* and truly paid. A recital of the fact in the deed is not sufficient, but it must be proved independently of the recitals in the deed."

(See also 23 Texas, 573.)

The same principle was also decided by this court at the present term, in case No. 3152, Harrington v. Williams & Burnett.

There is no proof in the record that Mills ever paid a cent for the land, except the recitals in their deed; and if they had, they are, like Townes, chargeable with all the defects in Haldeman's title, for the reasons already given.

*Hancock & West*, for defendants in error, filed an elaborate and able argument on both the facts and the law of the case. They insisted that the evidence showed a consideration for the conveyance from Lentz to Haldeman, and that, even if it had not, the burden of proof was on the defendants to show the contrary, in view of the recitals of the deed. Proceeding in their argument, they contended:

This was one of those cases in which the court might well have adopted the rule laid down in McDonald v. Hancock, an old case decided at Austin, December term, 1845, and reported in Alexander's Digest, page 296, where the court lays down this very sensible rule: "That it is a matter of little importance whether the jury understood the charge of the court or not, since they found according to the law and the evidence."

Even if there was error in the charge, yet if the jury disregarded it the judgment will not be reversed. (Hubby v. Stokes, 22 Texas, 217; Merriwether v. Dixon, 28 Texas, 15; Bond v. Mallow, 17 Texas, 637; Hedgepeth v. Robinson, 18

Texas, 871; Robinson v. Varnell, 16 Texas, 387; Weisioger v. Chisholm, 22 Texas, 672; Converse v. McKee, 14 Texas, 30.

Plaintiffs in error asked no instruction either as to failure of consideration or as to the purchase of an equitable title, and took no exception to the charge of the court. Hence, they cannot complain. (Mills v. Thatcher, 14 Texas, 16; 3 Texas, 401.)

When one who has the equitable estate conveys it by warranty deed, and subsequently acquires the legal title, that title vests in the vendee by virtue of the warranty and by estoppel. (3 Washburn on Real Property, 103, and authorities there cited; 4 Kent, 98; Box v. Lawrence, 14 Texas, 545; Mays v. Lewis, 4 Texas, 38; Duchess of Kingston's case, 3 Smith's Leading Cases, where all the authorities are collected.)

As to the effect of the issuance of a patent to a vendor who had previously sold the land granted him by the government, counsel also cited 10 Howard, 325; 11 Howard, 297; 21 Howard, 240; 9 Wendell, 209.

That the patent in the name of Lentz could supply neither title nor color of title to his heirs, when he had conveyed the land in his lifetime, counsel cited Harris v. Hardeman, 27 Texas, 248; Wright v. Dailey, 26 Texas, 731; Marsh v. Weir, 21 Texas, 110; Castro v. Wurzbach, 13 Texas, 128; Thompson v. Cragg, 24 Texas, 582; Eliott v. Whitaker, 30 Texas, 411; League v. Atchison, 6 Wallace, 118.

Presumptions must be indulged to support the proceedings of the probate courts in the early days. (Baker v. Coe, 20 Texas, 435; Poor v. Boyce, 12 Texas, 449; Dancy v. Stricklinge, 15 Texas, 557.)

LINDSAY, J.—It appears from this record that one Jacob G. Lentz, who became a resident with his family in Texas in the year 1832, and so continued till his death, in 1841, which gave him a claim under the colonization laws of Mexico—a claim guaranteed by Art. XV of the plan of the provisional government, as well as by the constitution of the republic and of the

State—to a headright of one league of land, as a colonist, sold and conveyed, on the 2d day of September, 1839, to one Jesse Haldeman, one-half of said league, upon which he was then settled, and in possession; and for which he subsequently obtained a grant from the State. The consideration for this sale was acknowledged in the deed to be five thousand dollars, with which the grantor therein professed to be fully satisfied. This deed was duly proven by the two subscribing witnesses, in 1840, and recorded in the proper office in the same year. It appears also, by this record, that Jacob G. Lentz, after the opening of the land office (he being one of the preferred class under the law in the location of claims), went before the board of land commissioners for Bastrop county, on the 12th day of April, 1838, within the six months prescribed for the preferred class, and established his right to, and obtained a certificate for his headright, which was located on the same day, on the identical land in controversy, as appears by the indorsement thereon of the surveyor of Bastrop county, the said Lentz then living on, and being in possession of the league. On the 20th of October, 1840, the clerk of the county of Bastrop, in which county the land was situate, certified that the certificate had been examined by the commissioners appointed for the detection of fraudulent land certificates, and was recommended by them for patent. On the 5th day of January, 1847, the district surveyor of Bastrop county again surveyed the same league for Jacob G. Lentz, who had then been dead six or seven years. Upon the return of the field notes to the land office the patent issued to Jacob G. Lentz, in whose name the certificate had been granted by the board of land commissioners.

There are a great many other facts suggested by the pleadings and offered in proof upon the trial; but the court does not deem them at all essential to the proper elucidation of the rights of the parties in this contest. It is believed that the substantive facts, which must determine the vital questions in this controversy, are sufficiently presented, though epitomised,

in this condensed narrative, derived from a most voluminous record.

By the common law this grant by the State to a dead man would be a nullity, totally inoperative and void. So, also, would it be by the civil law; as by each system there can be no grant without a grantee.

But by the act of the 4th Legislature, Session Acts, page 21, approved Dec. 24, 1851, which seems to have been omitted by the different digesters of the statutes of the State, but to which the attention of the court has been called by the learned and critical counsel, such a grant is made valid, whether the grant was made before or subsequent to the passage of the act. By the statute, then, the grant or concession is valid, though made to a dead man, and makes the land granted or conceded an estate of inheritance which the heirs of the grantee will take as such—not by concession or grant directly to them, but as inheritors of the estate of the ancestor.

According to the provisions of the act of the Congress of the 14th of December, 1837, in the 11th, 12th, 14th, 15th, 17th and 19th sections of said act, it is apparent that the certificate was properly obtained from the board of land commissioners; and the location made upon the land by the county surveyor of Bastrop county, in the lifetime of Jacob G. Lentz, nearly eighteen months before the date of the deed of conveyance to Jesse Haldeman. Even when no survey has been made, if such location is sufficiently specific, "so as to furnish notice to the ordinarily diligent," said this court in Lewis v. Durst, 10 Tex. 415, and in Hollingsworth v. Holshousen, 17 Tex., 44, "that the appropriation of the land has been made," the right is vested, as well before as after the survey. In this case it is error to suppose that the only pretended *legal* right of Jacob G. Lentz was founded on the Mexican laws of colonization. Those laws were abrogated before any *legal* right accrued to him, though the meritorious cause of that subsequent legal right was his coming in as a colonist. His legal

right had its foundation in the recognition, by the new political authority, of his claims upon the former government as a colonist, his residence in the country at the declaration of independence, and the authentication of the character of his claim by the official agents of the government, the obtention of the certificate from the commissioners, and its location upon the land. These were public official acts, which committed the government to the fulfillment of its sacred pledge, and which the government had provided in the act itself might be judicially enforced against its ministerial agents. This constituted the *legal tie*, the *obligation* of the government, and the *right* of the citizen. When the certificate was presented by the holder to the surveyor, he was authorized to survey any land, belonging to the public domain, pointed out to him by the owner of the certificate ; and it seems, from the indorsement of the surveyor upon the certificate, the identical land, " League No. 20, on Walnut creek, west of the Colorado river," was so pointed out to him. It is admitted in the answer of the defendants that a survey of the land had been previously made, whether by the official agents of the former, or of the new political authority, is immaterial, and an attempt made through one Robert Peebles, assuming to act as commissioner of Austin and Williams' colony, to carry it into grant. This survey, therefore, had been returned, under the law, with the archives to the general land office. And according to the case of Chadoin v. McGee (20 Tex., 476) the applicant had a right to select land already defined by metes and bounds, which public policy only required as a notification of others who might be seeking an appropriation of portions of the public domain. This view was virtually reaffirmed in the same case on its final decision at the Galveston term, 1868.

Then, upon this state of facts, what was the nature and character of the interest in the land held by Jacob G. Lentz at that time ? In the case of the Commissioner of the General Land Office v. Smith, 5 Tex., 480, this court considered a location and survey, by virtue of a valid certificate, a valid right,

a right of property, and the commissioner was compellable to issue a patent thereon; that it was a subject of taxation, capable of inheritance, and protected by the constitutional guarantees of the right of property, and consequently alienable by deed. (See, also, 3 How., 459; 1 Pet., 655, U. S. Reports. Every presumption is to be indulged in favor of the correctness of the action of the agents of the government; otherwise there would be great insecurity in all rights of property. Such indulgence is a necessary maxim in judicial polity for the stability of all civil affairs. The location was made, but the field notes were not returned to the land office until long afterwards; consequently the commissioner could not issue the patent. The surveyor indorsed on the recommended certificate that he did locate it on the land. Such location by him could only be by his then making the survey, or by his adopting a survey which he had previously made—either of which would be an actual severance of the land from the public domain. By various acts of the Legislature, the time for returning field notes to the land office was extended from time to time, and the equities of the locators were thus recognized and preserved. And from the final grant of this identical land to Jacob G. Lentz, it will be observed that the equity of his claim was respected, and was the basis of the patent. Certainly the location had never been abandoned by him; for he was then living, and continued to live upon the land till his death. Being in the actual possession of the land, with such a right and such an interest in it, it was, to all intents and purposes, property, subject to the conditions of bargain and sale, and of any mode of alienation, which he might choose to adopt. If the circumstances of the acquisition of this right had transpired subsequent to the act of the 24th of January, 1856, upon the subject of forced heirship, he might have devised by last will and testament the whole of it to whomsoever he pleased, and have disinherited those who now claim it as his heirs. He did bargain, sell, alien and convey one-half of the league, with the right to which he was thus invested, and of which he was then in possession, to the vendor of these

appellees, for the consideration of five thousand dollars, with which he acknowledged himself satisfied, and bound himself and heirs to make good the conveyance.

The subject matter of the sale and conveyance by Jacob G. Lentz to Jesse Haldeman, was one half of the land contained in "league No. 20"—the identical land upon which the certificate was laid, and for which the patent afterwards issued. Even admitting, for a moment, that Jacob G. Lentz had no title at the time of the sale, would he be permitted, if alive, to deny that he had title? In his deed, his *seizin* or possession of the land is distinctly affirmed; and both he and all in privity with him, are estopped from afterwards denying that he was so seized, or possessed at the time of his conveyance. The knowledge or want of knowledge by his vendee of the nature of the vendor's right, or title, or estate, is not of the least moment in the case, unless the vendor had practiced some fraud in the sale. Washburn, in his valuable work on Real Property, vol. 3, p. 99, says: "An estoppel works upon the estate and binds an after-acquired title, as between parties and privies." It is so decided by the Supreme Court of the United States, in the case of Van Rensselaer v. Kearney *et al.*, in 11 How. R., 325; also, in the case of the Lessee of French and wife v. Spencer *et al.*, in 21 How. R., 228. So that, if Lentz had no title at all at the time of conveyance, carrying the identical subject matter of the contract into actual grant afterwards, the title enured to the benefit of his vendee, as against his heirs, who were privies in estate as well as in blood. The case of McWilliams v. Nisly & Co., 2 Serg. and R., 507, 517, 518, cited by Washburn, where the ancestor had conveyed the "premises," the particular land, and his heirs claimed that when he conveyed he had no title, but acquired one subsequently, which had descended to them, seems to be almost directly in point with the present case. In that case, the learned judge pertinently asks: "Can the heirs recover against his grantees?" and proceeds to answer the question by saying: "It appears to me, in such a case, they would be estopped by

their father's deed from denying his title; and if there were occasion for further assurance, equity would compel them to make it." And his colleague in the same case said: "So, in equity, a grantor conveying land for which he has no title at the time, shall be considered as trustee for the grantee, in case, at any time afterwards, he should acquire title. Chancery would compel them (the heirs) to convey to the defendants," (the purchasers.) The authority is persuasive; and the tone of morality which it indicates, makes it not unsafe as an exemplar for imitation, when no positive law forbids judicial interpretation.

But, in addition to all this, there is a covenant of warranty in the deed against the heirs. In such cases the principle is, if the ancestor has wrongfully conveyed the land, with warranty, to make the covenant operate as a *rebutter* to the claim of the heirs to whom the assets descended, and thereby prevent circuity of action. Because, if they hold the land, which is real assets, it should be, in honesty and justice, subjected to the payment of the damages for the breach of the covenant of warranty. For, if the land is recovered from the covenantee, he has his right of action to recover from the heirs upon the covenant of warranty. The heirs being estopped by the deed of the ancestor to deny his title, they are equally concluded by the express and solemn recitals in the deed. Persons, not in privity with the grantor, would not be affected by such recitals. Of the amount of the consideration, and of its nature and character, which he required for the conveyance, he was the sole and exclusive judge. No fraud, nor force, nor duress, is alleged to have been used in the obtention of the deed. If such an allegation had been made, the burden of proof would have been upon the defendants. Nothing in the statement of facts conduces, in the slightest degree, to manifest any such undue advantage.

From the view thus far taken of this case, it will be observed that this is a contest for land between the heirs of the grantee of the government and purchasers, deriving title under a deed of

XXXII—23.

conveyance, with a covenant of warranty, from the ancestor of those heirs, made in his lifetime. It is clear to the mind of the court, from the principles of law adverted to in this opinion, that the heirs, under this state of case, are precluded from taking and holding.

But it appears that there was only one of the heirs in the occupancy of any portion of the land in controversy; and that heir, from the proof, held actual possession of only a portion of the land, by metes and bounds, as her share of the inheritance, and against whom, and those holding under her and her husband, the suit was brought. This heir, in defense, set up the statute of limitations of three years, having occupied such portion of the land from the fall of 1853 till the bringing of this suit in 1857. Now, if this heir was simply attempting to hold by heirship, she was equally estopped by the deed of the ancestor, and was not in a condition to plead the statute. The ancestor having disposed of his right in his lifetime, and the title, when the patent issued, having inured to the benefit of his vendee, the heir had neither title nor color of title by a regular, or an irregular, consecutive chain of transfer from the sovereignty of the soil. Without such title, or color of title, the plea is unavailing. If this were a case in which the doctrine of estoppel did not apply, there would be much force in the very able and plausible argument of the learned counsel for the appellants, upon the construction of the three years' statute of limitations. But the court is constrained to believe that this is not the character of case in which repose was sought to be attained by that statute.

Wherefore, the judgment of the court below is affirmed.

Affirmed.