**The ATLANTIC REFINING COMPANY,**
**Petitioner,**

**v.**

**W. D. NOEL et al., Respondent.**

**No. B–331.**

Supreme Court of Texas.

Oct. 9, 1968.

As Modified on Denial of Rehearing
Jan. 15, 1969.

Dissenting Opinion Feb. 19, 1969.

Stubbeman, McRae, Sealy & Laughlin, W. B. Browder, Jr., and Durward M. Goolsby, Midland, for petitioner.

Crawford Martin, Atty. Gen., J. Milton Richardson, Asst. Atty. Gen., Austin, Shepperd & Rodman, Odessa, Pat H. Candler, Dallas, for respondent.

POPE, Justice.

Our former opinion is withdrawn and this opinion is substituted for it. This is a vacancy case. Atlantic Refining Company filed a trespass to try title suit against J. S. Lane, Harry Howard and wife, Bankers Life Company, a mortgagee, and W. D. Noel, the holder of a mineral lease covering the alleged vacancies; and the State of Texas intervened on behalf of the Permanent Free School Fund. The case was tried before the court without a jury. The trial court sustained Atlantic's contentions and rendered judgment that there were no vacancies in the area claimed by the defendants. The court of civil appeals reversed that judgment. 414 S.W.2d 718. The basis for the decision of the court of civil appeals was that Atlantic is estopped to deny the existence of the vacancies. We are of the opinion that there is no basis for principles of estoppel to operate so as to defeat Atlantic's title to the disputed lands. We reverse the judgment

of the court of civil appeals and affirm the judgment of the trial court.

Most of the facts are not in dispute and only a brief summary is necessary. In 1881 H. C. Barton, acting upon valid certificates, located, surveyed and returned the field notes to Blocks 1 and 2, M. K. & T. R. R. Co. in Upton County. All of the odd numbered sections in Blocks 1 and 2 were patented to the railroad. In 1904, John R. Johnston made application to purchase Section 26, Block 1 from the State. In 1905 H. R. Smith made application to purchase Section 10, Block 1. The State awarded the sections to Johnston and Smith, and both awards were based upon the Barton survey and field notes.

Barton's surveys of Blocks 1 and 2 were done as one continuous work. Both the surveyor for Atlantic and the surveyor for the State so testified. Barton worked in Block 1 on October 6 and the next day moved on to Block 2 which adjoined Block 1 on the north. It is undisputed that Barton called for joinders of Blocks 1 and 2, and set a monument at the northeast corner of Section 10, Block 1, which monument was the same point for the southeast corner of Section 1, Block 2. The north line of Sections 26 and 10, Block 1, and the south line of Block 2 were the same. According to Barton, there was no vacancy between Blocks 1 and 2, and it was upon the basis of his work that the State patented the odd numbered sections and made the awards to Johnston and Smith.

In 1909, Union Land Company, through mesne conveyances from the original awardees, was the owner of both Sections 26 and 10. At that time the state debt had not been paid, and the sections were yet unpatented. Union asked the Land Commissioner to cause a resurvey to be made and in 1913 the Land Commissioner instructed H. S. Dod to resurvey Blocks 1 and 3.

Dod made a resurvey of Block 1 in 1913. Block 2 was apparently not resurveyed. It is undisputed that Dod did not follow the

Land Commissioner's instructions, by reason of which he did not go to at least twelve different monuments set by Barton in Blocks 1 and 2 which were on the ground then and are still there today. Dod's field notes did not call for adjoinder of the north lines of Sections 26 and 10 with Block 2 which was Barton's admitted intent. Dod's resurvey showed 670 acres of land in each of the sections rather than only 640 acres as described by Barton, but Dod's monuments were located in such a way that they left 60.5 acres between Section 10 in Block 1 and Section 1 to the north in Block 2. His monuments also left 94.5 acres between Section 26 in Block 1 and Section 15 in Block 2 to the north. These are the areas which the court of civil appeals has held to be vacancies. The situation is shown by this sketch.

In 1926 Union Land Company conveyed Sections 26 and 10 to Cordova Union Oil Corporation. In 1943 Cordova conveyed the minerals to Sections 26 and 10 to Atlantic Refining Company, thereby severing the surface and mineral estates. Thereafter Cordova Union conveyed the surface of Section 10 to J. S. Land and conveyed the surface of Section 26 to Harry and Mabel Howard. In 1944 Cordova Union paid the state debt on both sections upon the basis of 670 acres in each survey. Lane and the Howards, the surface owners, later became indebted to Bankers Life Company, and in January 1946 Bankers Life, the mortgagee of the surface owners, applied for and obtained patents to the two sections upon payment for 670 acres of land to the State. The patents were issued based upon the Dod field notes. They were issued in the name of E. G. King, assignee of H. R. Smith, covering Section 10, Block 1, and in the name of John R. Johnston, the original applicant to purchase Section 26, Block 1.

In 1961, W. D. Noel filed a mineral application to lease the 60.53 acre-tract and the 94.5-acre tract above mentioned, contending that such tracts were unsurveyed lands belonging to the Public Free School Fund. See, Article 5421c, Vernon's Ann. Tex.Stats. The alleged vacancies were recognized by the Land Commissioner and Noel's application was approved. Later patents covering such tracts were issued to J. S. Lane and to Harry and Mabel Howard as good faith claimants.

It is not disputed that Atlantic proved its title to the lands and that there is no vacancy unless Atlantic is estopped to claim under the Barton survey. It is our opinion that there is no vacancy. Dod's mistakes in surveying are not the reasons for our conclusion that there is no vacancy. It is our opinion that the court of civil appeals erred in its holding that Atlantic is estopped to deny the existence of the vacancy. There can be only three possible

acts which could afford the basis of an estoppel, none of which, in law has ever previously been held sufficient to divest a landowner of his vested rights. They are (1) Union Land's request for a resurvey, (2) the Land Commissioner's acceptance of the resurvey, or (3) the acceptance of a patent by the surface owners who were outside of Atlantic's chain of title and which patents used the Dod field notes in describing the land. No precedents support an estoppel based upon any of the stated theories.

When Johnston and Smith obtained their respective awards for Sections 26 and 10, each for 640 acres, those lands had been segregated from the public domain. At that time Johnston and Smith had rights which would support a legal action including a suit for trespass to try title. Art. 7375, Vern.Tex.Civ.Stats.; Duren v. Houston & T. C. Ry. Co., 86 Tex. 287, 291, 24 S.W. 258 (1893); See, Lange, 3 Texas Practice, Land Titles, § 112.

The survey, location, and return followed by the awards based upon those acts vested legal rights in Johnston and Smith. Threadgill v. Bickerstaff, 87 Tex. 520, 29 S.W. 757 (1895); Ross v. Early, 39 Tex. 390 (1873); Howard v. Perry, 7 Tex. 259 (1851); Stubblefield v. Hanson, 94 S. W. 406 (Tex.Civ.App., 1906, writ ref.); Watts v. Bruce, 31 Tex.Civ.App. 347, 72 S. W. 258 (1903, writ ref.). It was said in Hamilton v. Avery, 20 Tex. 612, 635:

"*Our courts have recognized a survey, by virtue of a valid certificate, as a valid right; a right of property, as fully as any other rights.* It is a right binding on the government; upon which the government, through the commissioner of the general land office, can be compelled, by judicial process, to issue a patent * * *. It is recognized by the government as his property, and not public domain, by being taxed and sold for taxes, the same as titled lands * * *. *It confers the right to maintain a suit upon it, to try the title and eject trespassers.* It gives a right which is the subject of possession; of purchase; and of inheritance. It is sold under execution, and administered in courts of probate. It is regarded in the community as possessing but little less marketable value than patented land." (Emphasis supplied)

In Morrill v. Bartlett, 58 Tex. 644, 649 (1883), the question was whether the rights of a party acquired under a valid certificate followed by a survey, location, and return of the field notes were changed by the issuance of a patent which used a different set of field notes to describe the land. The court wrote:

"It is not disputed but that this grant was located upon vacant land by virtue of a genuine certificate; that it was legally surveyed by the proper officer; that it was correctly traced upon the county map in the surveyor's office; that the certificate, survey, field notes and a copy of the map were duly filed in the general land office; and that, according to these, the land has a common corner with the Gooch survey at the end of its second line. *These facts established, and no error in the field notes being shown, nor other reason why the patent should not issue in accordance with the actual survey made, the grantee had a just and equitable right to the whole land thus surveyed and described*; a title upon which he could recover, against any party claiming under a junior grant, any portion of the land included within the boundaries of such survey. Not only so, but *he became authorized to have his title evidenced by a patent describing the land precisely as surveyed*, and to compel the commissioner of the general land office to issue it to him. * * *

"The law no where recognizes his right to change the calls of the field notes, or leave out any portion of them, so as to grant to the patentee a different tract of land from that actually run out by the surveyor." (Emphasis supplied)

■ The issuance of a patent is a mere ministerial act. Whether it is issued or not does not defeat legal rights, which are vested. Seibert v. Richardson, 86 Tex. 295, 297, 24 S.W. 261, 262 (1893); Adams v. Houston & T. C. R. Co., 70 Tex. 252, 268, 7 S.W. 729 (1888); Gullett v. O'Connor, 54 Tex. 408 (1881); Gould v. West, 32 Tex. 338, 339, 351 (1869); State v. Delesdenier, 7 Tex. 76 (1851). The rights of parties are determined "by the priority of valid location, not by the mere issuance of the patent. A survey under a valid location, although unpatented, will prevail over a patent issued under a location subsequently made upon the same land." Whitman v. Rhomberg, 25 S.W. 451 (Tex.Civ.App.1894, no writ).

From these principles, we conclude that Johnston and Smith by force of their awards owned an equitable title in lands that had been segregated from the public domain at the time the awards were validly issued. "The state retained in herself the legal title to land to secure the payment of Hilliard's 'obligation or note.' The state was concerned with the land no further than as such security." Elliott v. Nelson, 113 Tex. 62, 251 S.W. 501 (1923). We reach, therefore, the question whether these vested rights were terminated in some way.

Union Land in 1913 requested a resurvey, which the Land Commissioner authorized and which Dod made. Union Land and its successors did nothing after the resurvey. It did not accept patents based upon Dod's erroneous survey. Union Land's vendee, Cordova Union, did not request or accept patents; and Atlantic, the vendee of the mineral estate, did not request or accept patents based upon the Dod field notes. Neither Atlantic nor its predecessors ever acted in recognition of the Dod survey. In fact, nothing on the face of the Dod field notes showed that there was a vacancy or that those holding under valid awards owned less than 640 acres. Dod's field notes showed and would lead the owners to believe that they in fact owned an excess of thirty acres more than Barton's survey showed. The maps in the office of the Land Commissioner showed no vacancy.

■■ The Land Commissioner accepted and filed the Dod resurvey, but he did not cancel the Barton survey. In any event, a Land Commissioner is not possessed of power to divest title nor to enlarge titles to lands by the ordering and acceptance of resurveys. It has been the consistent holdings of this court that the acceptance of a resurvey can not authorize the inclusion of lands not included in the original survey. Turner v. Smith, 122 Tex. 338, 61 S.W. 2d 792, 801 (1933); State v. Post, 106 Tex. 468, 500, 169 S.W. 407, 408 (1914); Texas & P. Ry. Co. v. Thompson, 65 Tex. 186 (1885). Neither should property rights which have already vested be the subject of divestiture by the acceptance of a resurvey by the Commissioner. Carmichall v. Stanolind Oil & Gas Co., 256 S.W.2d 129 (Tex.Civ.App.1952, writ ref.).

■ We do not question the settled rule that vested rights in unpatented lands may be lost by an owner's acts which estop him to claim outside his patent calls. We do, however, question the power of a remote surface vendee who is outside of Atlantic's chain of title, to accept a patent and thereby work an estoppel which divests Atlantic of its severed mineral rights. Atlantic and its predecessors have never accepted a patent which recognized the Dod survey.

The act relied upon for the creation of an estoppel against Atlantic Refining Company as owner of the mineral estate is the act of the owners of the surface to Sections 26 and 10. It is an act of the surface owners done long after the mineral and surface estate had been severed and after Atlantic obtained its title to the minerals in 1943. To estop Atlantic under such circumstances would mean that the owner of a mineral estate can be estopped by conduct of the surface owner over whom he has no right of control. It would mean that a mineral owner may be estopped by the conduct of the surface owner after the sever-

ance of the mineral and surface estates and about which the mineral owner had neither constructive nor actual notice.

■ At the time the surface owners accepted patents the mineral estate had already been severed. The severance resulted in surface and mineral estates which were separate and distinct. Humphreys-Mexia Co. v. Gammon, 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607 (1923); Hager v. Stakes, 116 Tex. 453, 294 S.W. 835, 842 (1927); Yates v. State, 3 S.W.2d 114, 118 (Tex.Civ.App.1928, writ ref.); Slack v. Magee Heirs (Tex.Civ.App.), 252 S.W.2d 274, 278, aff'd Magee Heirs v. Slack, 152 Tex. 427, 258 S.W.2d 797 (1953). It follows that the acceptance of the patents by the surface owners in 1945 was not in the chain of title to the mineral estate which was severed in 1943. Andretta v. West, Tex.Civ.App., 402 S.W.2d 543, rev. 415 S.W.2d 638 (Sup.Ct.1967); White v. McGregor, 92 Tex. 556, 50 S.W. 564, 71 Am. St.Rep. 875 (1899). This point was presented in State v. Alford, 175 S.W.2d 678 (Tex.Civ.App.1943, writ ref. w. o. m.). The case held that a vendor, Parsons, by the acceptance of a corrected patent could not disparage the title of his prior vendee. The court said:

"James A. S. Parsons, having parted with his title to said land and his interest in said certificate on December 18, 1852, by his deed to William Harnage, could do nothing to disparage the title Harnage had to said land by his action in attempting to cancel the original patent of the H. B. Dance survey and to secure a corrected patent for himself from the Commissioner of the General Land Office * * *.

"Appellants contend, however, that appellees had constructive notice of the proceedings in connection with the cancellation of the original patent and of the reissuance of a corrected patent. This contention cannot be sustained, since the registration of an instrument is notice only to those who claim through and under the grantor or mortgagor by whom the instrument was executed. White v. McGregor, 92 Tex. 556, 50 S.W. 564, 71 Am.St.Rep. 875; 36 Tex.Jur. 476.

"*The corrected patent of the Dance survey was issued on September 11, 1860, eight years after Harnage acquired the land from Parsons, and was therefore not a part of the chain of title of Harnage or his vendees herein.*" (Emphasis supplied)

Atlantic and its predecessors in title in no way participated in the actual acceptance of the patent by the surface owners. We have found no decision which holds that an estoppel arises under such a state of facts. In Austin v. Dungan, 46 Tex. 236 (1876) an estoppel arose against the one who "applied for and obtained the patent upon this resurvey." In Anderson v. Robison, 111 Tex. 402, 229 S.W. 459, rev'd. on rehearing, 111 Tex. 402, 238 S.W. 883 (1922) an estoppel was held to exist against an owner's predecessor who prepared corrected field notes, and "calls for his patent and accepted it, * * *." In Holmes v. Yates, 122 Tex. 428, 61 S.W.2d 771 (1933) an estoppel operated to defeat an owner's rights to 233 acres of land because "Miller (the owner) accepted title to his 407 acres, abandoning all claim to more land." In Miller v. Yates, 122 Tex. 435, 61 S.W.2d 767 (1933) the one estopped was held to be the one who "accepts a patent." In Turner v. Smith, 122 Tex. 338, 61 S.W.2d 792 (1933) the court held that the "patentee, and those claiming under him are estopped to claim any land lying outside the bounds of that patent." It has always previously been the one who accepts a patent and those claiming under him who has been estopped. Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 133 S.W.2d 767 (1939); Wofford v. Miller, 381 S.W.2d 640, 647 (Tex.Civ.App. 1964, writ ref. n. r. e.); Proctor v. Markham, 271 S.W.2d 685, 690, 691 (Tex.Civ. App.1954, writ ref. n. r. e.). The correct

principle is summarized in the last cited case:

"*  *  *  No overt acts by appellants and their predecessors in title are alleged or proved. We think that before the rule as laid down in Miller v. Yates, supra, would apply, the appellant must have requested and received a patent on said Estes field notes. This has not been done, and we hold that they have not lost any rights they had under the original field notes.*" (Emphasis supplied)

A rule which would permit the acts of a surface owner to reduce the ownership of the mineral estate, even without notice or knowledge of the facts by the mineral owner, is one which should be announced with some caution. It would mean that Cordova Union, which owned both the minerals and surface prior to 1943 could first convey the minerals, later accept a patent with reduced acreage, and estop its vendee even though this would be in derogation of its own deed. Cordova Union could then assert a good faith claim not only to the surface but to the mineral estate which it had effectively defeated. Cordova Union could, sub silentio, empower its remote surface vendees with the same power to accept a patent and reduce the mineral acreage.

Atlantic instituted this suit to try its title to the mineral estate which it claimed to own. The State of Texas intervened and by cross action sued in trespass to try title as to the mineral interest only. The surface of the claimed vacancy is not in issue in this action, and we make no adjudication of the surface ownership. We reverse the judgment of the court of civil appeals and affirm the judgment of the trial court that there is no vacancy with respect to the mineral estate, in the lands described above, and that Atlantic have judgment for the two described mineral tracts.

The motion for rehearing of the State of Texas is overruled.

WALKER, Justice (dissenting).

I adopt the following Dissenting Opinion filed by Associate Justice James R. Norvell on October 9, 1968, prior to his retirement from the Court:

In my opinion, the judgment of the Court of Civil Appeals which reverses the judgment of the trial court should be affirmed and, accordingly, I respectfully dissent from the order of this court which affirms the judgment of the trial court.

While I have found no precedent which controls the situation presented by the record in this case, I would adopt a policy supporting the certainty of land titles. After all, the holder of the mineral interest could have protected itself from loss. To me, the authorities cited by the Court of Civil Appeals are by analogy persuasive and suggest the correct answer to our problem here. In this case, the petitioner prays for equitable relief and one of the oldest maxims in our jurisprudence is that equity aids the vigilant and not those who sleep on their rights.

The judgment of the trial court creates a most unusual title situation. It cancels two patents and the Noel mineral leases. The patents issued covered 60.53 acres lying either north of or within Lot 10, Block 1, which for convenience, I shall refer to as tract 10-V, and a 94.5 acre tract lying either north of or within Lot 26, Block 1, which I shall refer to as tract 26-V. The trial court's judgment did not purport to cancel or reform the 1946 patents to Section 10, Block 1, and Section 16, Block 1. These patents were issued on the Dod field notes. Now, who owns the surface estate in and to 10-V and 26-V, which tracts are not included within the Dod notes? I suppose the State does as the Lanes and Howard do not. Then for the first time, so far as I have been able to determine, we have this situation: Under the trial court's judgment, the extent of the surface area of Section 10, Block 1, and

Section 26, Block 1, which excludes tracts 10-V and 26-V, differs from that of the mineral estate which includes tracts 10-V and 26-V as they are embraced within the Barton field notes. Atlantic's mineral interest does not constitute a legal estate because under the trial court's judgment, it necessarily follows that there is no patent covering tracts 10-V and 26-V, although Atlantic holds either the equitable title or some equitable right to the minerals under such tracts. My fear is that in giving precedence to the certificate field notes of Barton over the patent notes *without reforming the patent,* we encounter evils we know not of and enter a title thicket we had best avoid as the exalting of the certificate over the patent may not only unsettle the title to a particular tract or section but adjoining sections as well. A purchaser buys a junior survey adjoining Section X which has been patented upon a resurvey. If before patent there has been a severance of the mineral and surface estates in Section X, how is the purchaser of the adjoining section going to know whether the owner of the mineral estate in Section X has acquiesced in the patent (resurvey) notes or not? I need not give further examples of possible title complications, but I do say that the simpler and more practical solution of our problem here is to say that the holder of a mineral interest in unpatented land is under a duty to see that a correct patent is issued and that he cannot shut his eyes to the land office situation and then maintain that a patent issued at the instance of one who under the law is entitled to apply therefor, has no binding force on him.

The factual situation here is comparatively simple. Applications to purchase Sections 10 and 26, Block 1, were made by H. R. Smith and John R. Johnston in 1904 and 1905 under the provisions of Chapter 12A, Title 87, Articles 4218b to 4218y, inclusive, of the Revised Statutes of 1895. These applications and the certificates issued thereon had reference to a survey made by H. C. Barton. This was long before the separation of the surface and mineral estates became a common thing in Texas. In 1913, Union Land Company, the then owner of Sections 10 and 26, Block 1, and Atlantic's predecessor in title, requested a survey of the two sections. A resurvey was made by R. S. Dod and accepted by the Land Commissioner. After this event, which to me seems to be the controlling one in our present situation, the mineral estate was separated from the surface estate. This took place in 1943, some thirty years after the Land Commissioner had approved the Dod field notes, an event which a careful purchaser should not have ignored. In 1946, a patent was issued upon the application of Bankers Life Company, evidently acting on behalf of the surface owners. Since the Dod field notes were the latest approved field notes in the office of the Land Commissioner, they were transcribed into the patents issued in the name of E. G. King, assignee of H. R. Smith, the original applicant to purchase Lot 10, Block 1, and John R. Johnston, the original applicant to purchase Section 26, Block 1.

These patents were issued under the provisions of Article 5413, Vernon's Ann.Tex. Stats.,[1] which contemplates that a patent

---

1. Article 5413 reads as follows:

"The Commissioner shall issue patents when it appears from the books of his office that full payment for the land has been made where payment is required, and all legal fees due thereon have been paid into said office and not withdrawn, including the legal fees for the recording of said patent in the counties in which the land may be located. When one applies for a patent such person, shall, in addition to all other payments required by law, remit to the land office one dollar for each county in which the land may be wholly or partially located and give the name and address of the owner or agent. When the patent is ready for delivery the Commissioner shall send it by registered mail to the clerk of any such county with the receivers check for one dollar for each such county and accompany the same with the name and address of the owner or his agent.

shall issue as a matter of course when the land has been paid for and the necessary fees have been tendered. Conceivably, many persons may have acquired interests in a section of land prior to the issuance of a patent. It is not required that the Land Office notify all persons claiming an interest in the section that a request for the issuance of a patent has been made. Patents are generally issued in the name of the original applicant to purchase,[2] and if he be dead, the patent operates to convey and secure valid title to his heirs or assignees. Article 5414, Vernon's Ann.Tex.Stats.

In my opinion, when corrected field notes are prepared and accepted by the Land Commissioner, the corrected notes become the official notes of a section or survey. If such corrected notes are not in turn set aside and another set of field notes prepared and approved before the issuance of patent, then, upon final payment of the purchase price, a patent may be issued as a matter of course and the corrected field notes will constitute the description of the land granted by the State.

Article 5413 does not require that all of the owners of interests in a particular section must apply for a patent before it can be issued. The statute which had its origin in 1891 [3] seems to contemplate that the person (or persons) who made application to purchase, or an assignee of the applicant's entire estate, would apply for the patent upon payment of the purchase price. It seems apparent, however, that the prime prerequisite for the issuance of a patent is final payment of the purchase price. The

owners of the surface estates in and to Sections 10 and 26, Block 1, were entitled to apply for the patent. In 1943, when the petitioner acquired the mineral estate, Dod's corrected field notes with the Commissioner's approval had been on file in the Land Office for some thirty years. Petitioner knew, or was charged with knowledge, that patent would issue upon the Dod notes upon completion of the payment of the purchase price unless the inaccuracy of the Dod notes was pointed out and corrections made thereto. It may be that the discrepancy between the Dod notes and the original notes prepared by Barton was not readily apparent, but this circumstance should not operate to change the rule. From 1913 to 1945, when patents were issued, Dod's resurvey constituted the official notes for Sections 10 and 26, Block 1. During this period, no attack was made upon them and no error was asserted with regard thereto. Under such circumstance, the issuance of the patents should be held binding upon petitioner.

In Miller v. Yates, 122 Tex. 435, 61 S.W. 2d 767 (1933), this court said, "[W]e reaffirm the soundness of the principle that the assignee of a land certificate loses all title or claim to so much land as may be included in an original file and survey thereunder as is without the limits of a corrected survey on which such assignee accepts a patent." It is true that petitioner did not apply for the patent and it may be argued that it did not accept the patent, but the actions of Union Land Company, its predecessor in title, in procuring the Land Commissioner's acceptance of a resurvey

---

Upon receipt thereof the clerk shall record the patent and send the same by registered mail with such name and address and the remaining fees to the clerk of another proper county until the patent has been recorded in each such county, and thereupon the patent shall be delivered to the proper party by registered mail."

2. With reference to issuance of patent to assignee, see, 3 Texas Practice—Land Titles (Lange) § 155.

3. "Be it enacted by the Legislature of the State of Texas: That the Commissioner of the General Land Office is hereby authorized and required to issue and deliver all patents now or hereafter to be ready for issuance and delivery, to the person entitled to receive the same when it appears from the books of said office that the legal fee for said patent has been at any time heretofore deposited in said office, and not withdrawn." (Acts 1891, 22nd Leg., ch. 115, p. 182, 10 Gammel's Laws of Texas, 184)

of Sections 10 and 26, Block 1, coupled with Atlantic's failure (and that of its predecessors in title) to secure a correction of the errors in the resurvey before the time the patents could legally issue, should be held substantially equivalent to an acceptance of the patents. By its inattention to its business, its laches and delay, Atlantic should be precluded from asserting the priority of the certificate notes (by Barton) over the field notes of the patent.

It may be that in 1943, when it acquired its equitable right or title to the minerals underlying Sections 10 and 26 of Block 1, Atlantic regarded such interests as having a speculative or unproven value and for that reason made no investigation of the records of the Land Office and hence did not know that a resurvey of such sections had been approved by the Land Commissioner. Apparently, Atlantic paid no part of the purchase price to the State but regarded this as a duty primarily resting upon the surface owner. Perhaps Atlantic has done nothing of a particularly culpable nature, but it has done nothing, at least up to the time of the institution of the present suit. This should be enough to bar a recovery in this case. As property ownerships, the extent of which we do not know, may be affected by our decisions in suits such as this, I would avoid complications which are bound to arise once we recognize that a survey may have one area on the surface but a more or less extensive area below the surface.

From what has been said, it should be clear that this is not a case in which the correction of a patent is sought. Of course, a patent can be reformed so as to correctly describe the land actually severed from the public domain if such may be done without injury or prejudice to others, such as innocent purchasers for value. But no attempt was made here to reform the patents issued by the State to Sections 10 and 26 of Block 1. A proper patent, from Atlantic's standpoint, could have been issued had

timely action been taken, but such action was not forthcoming.

The facts in Holmes v. Yates, 122 Tex. 428, 61 S.W.2d 771 (1933), are in many respects similar though not identical to those revealed by the present record. I quote therefrom because it clearly and accurately presents the dangers of unsettling land titles incident to the disregarding of corrected field notes contained in patents. In *Holmes,* Mr. Justice Greenwood, speaking for this court, said:

"The controlling contention of plaintiffs in error is found in the following portion of the argument of their counsel, on pages 15 and 16 of their brief in the Supreme Court, to wit: 'If corrected field notes leave out or exclude land not in actual conflict with a senior survey, they are unauthorized and incorrect, and cannot be considered a substitute for the originals. If they are not truly correct, then, there is no substitute, and the result, the original surveys remain the same and the field notes thereof constitute the section of land. In this case, no doubt the Land Commissioner was justified in making an investigation, but he had no authority to call upon the locating surveyor to correct the field notes so far as to cause the survey to conform to the maps and records of his office. The law required the Land Commissioner to correct his maps and records to conform to actual surveys on the ground, rather than have the surveys which had been made on the ground changed so as to correspond with such maps and records of his office. It is true the so-called corrected field notes did not go outside of and include land not included in the original survey, but it is equally true that they did not include all of the land within the original survey not covered by a senior survey, and for that reason are incorrect and unauthorized. Corrected field notes to be given effect as being authorized, should not be confined to the original

survey, but it is essential that they should not exclude land which is free from conflict on the ground with a prior location and survey. *In other words, for the corrected field notes to be correct and authorized under the law, they must be confined to the original survey and must embrace all the land therein not in conflict on the ground with land previously appropriated. These so-called corrected field notes do not meet such requirements for the reason they exclude the land in controversy which should have been embraced therein.'*

"The court is unable to recognize the soundness of the above contention. *It would be difficult to conceive a more far-reaching method for unsettling land titles throughout Texas than for the Supreme Court to sanction the contention of plaintiffs in error.* Instead, we regard as entirely correct the first counterproposition of defendants in error Yates and another, which is as follows: 'Where corrected field notes of a survey made under a located land certificate and of its alternate school survey are required to be filed by the Commissioner of the General Land Office to take same out of a conflict with prior and senior locations as shown by maps, records and archives of the General Land Office the fact that many years later it is discovered that the conflict on the ground existed only as to part of the area embraced in the original field notes but excluded from said corrected field notes, instead of the whole of it, does not render said corrected field notes void, and make the said school land alternate thus embrace all the area within the original field notes not actually in conflict, and which might have been, but were not, included within such corrected field notes, so that one who several years before such discovery had purchased such school land alternate location under said corrected field notes could not be held to have acquired title to such excluded area as against intervening purchasers thereof from the state of a subsequently made survey embracing such area.'"

The emphasis appearing in the above quotation has been supplied.

CALVERT, C. J., notes his dissent.

Associate Justice WALKER adopts the dissenting opinion of former Associate Justice NORVELL delivered October 9, 1968.

Associate Justices REAVLEY and McGEE not sitting.